**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LAVERNE JOHNSON,

                 Petitioner,

      v.

VINCENT CULLEN, Acting Warden of
California State Prison at San Quentin,

                 Respondent.

NO. C 95-0305 TEH

ORDER RE CLAIMS F, G, H, I, J,
K, L & W.

<u>DEATH PENALTY CASE</u>

## INTRODUCTION

On December 17, 1987, petitioner was convicted by a San Mateo County jury of two counts of first degree murder, Cal. Penal Code § 187, and one count of arson, Cal. Penal Code § 451(b). The jury also found true the multiple murder special circumstance allegation, Cal. Penal Code § 190.2(a)(3). The same jury fixed the penalty at death on February 5, 1988. On October 18, 1993, petitioner's conviction and sentence were affirmed on direct appeal. *See People v. Johnson,* 6 Cal.4th 1 (1993).

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Petitioner filed a habeas petition on April 22, 1997.[1]  On that same day, he also filed his second state habeas petition in the California Supreme Court.  On May 2, 1997, respondent filed a motion to dismiss the federal petition on the ground that it contained unexhausted claims.   On November 25, 1997, the California Supreme Court denied the second state habeas petition.  Petitioner subsequently filed an amended federal petition in which he incorporated claims from the second state habeas petition.

Respondent originally filed an Answer, a Memorandum of Points and Authorities in Support of Answer and a Motion for Summary Judgment on October 22, 1999.  The Motion was denied by the court as premature.  After various matters were resolved, petitioner filed a Traverse; respondent subsequently filed a Supplemental Answer, which included briefing on procedural issues and on the merits of petitioner's claims.  Petitioner filed a responsive Memorandum of Points and Authorities in Support of Non-Hearing Claims[2]; respondent subsequently filed, per court request, a supplemental brief.  This court has previously issued an Order resolving respondent's claims of procedural default and untimely filing.  This Order will resolve guilt-phase claims for which the California Supreme Court issued a reasoned opinion on the merits.[3]  This includes Claims F, G, H, I, J, K, L and W.  For the following reasons, Claims F, G, H, I, J, K, L and W are DENIED.

**FACTUAL BACKGROUND**

---

[1] In *Woodford v. Garceau,* the United States Supreme Court held that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply to all cases in which a petition for a writ of habeas corpus was filed after April 24, 1996, the effective date of AEDPA.  538 U.S. 202, 206-08 (2003).  In light of *Garceau*, AEDPA applies to petitioner's habeas petition, which was filed on April 22, 1997.

[2] Petitioner's Memorandum addressed the merits of all of his claims except Claim M, for which he is seeking an evidentiary hearing.

[3] The remainder of petitioner's claims that have been briefed will be addressed in subsequent orders.

United States District Court

For the Northern District of California

The Supreme Court of California summarized the factual background of this case as follows in its opinion disposing of petitioner's direct appeal, *People v. Johnson*, 6 Cal. 4th 1 (1993). The state court's factual findings are presumed to be correct pursuant to 28 U.S.C. § 2254.

On January 15, 1986, police officers and firefighters were summoned to a house fire in Daly City. Inside the house, the officers found the bodies of Maria Victoria Holmes, aged 52, and her daughter, victim Luisa Anna Castro, 32. The evidence indicated that two fires (one upstairs, and one downstairs) had been intentionally set, probably through the use of some flammable liquid. Victim Holmes evidently had been severely beaten and kicked. Her body showed extensive contusions and abrasions; her face was swollen and bloody. An autopsy indicated she died from 12 or more blows to her head and face. Victim Castro's body was burned beyond recognition; a large knife was found nearby. An autopsy determined, however, that she had died from strangulation; a wire was found wrapped tightly around her neck.

Further investigation revealed the following facts: Victim Holmes was a hotel manager who wore expensive jewelry and possessed an extensive collection of gold jewelry from Central America. She shared her home with her daughter, victim Castro, a nightclub security guard, who was currently dating defendant [petitioner Laverne Johnson], a customer of the club. Castro also had a collection of gold jewelry and frequently boasted of it. On the night of the murders, Castro had prepared dinner for defendant at her home after they had driven her children to a babysitter. Later that evening, someone murdered the two women, stole their jewelry, and set fire to their home in an apparent attempt to cover up the crimes.

Defendant was arrested after a girlfriend, Roshaun Fuller, told police that he had admitted assaulting the women and taking their jewelry. According to Fuller, defendant stated he "knocked out" Castro and, when victim Holmes came upstairs to investigate, he knocked her down and kicked her in the head. Defendant had been seen wearing, and later pawning, some gold jewelry, although it could not positively be traced to the victims. Defendant also admitted to the investigating officers some facts regarding his relationship with Castro, including sharing dinner with her at her home on or about the night of the murders. According to defendant, he left the house after Castro had become intoxicated and fallen asleep. Although defendant denied killing the women, at one point he told the interrogating officer that, "I probably did do it, but you are not going to get me to say I did do it."

The defense offered an alibi (defendant was seen engaging in a bar fight on the day in question) and evidence to cast doubts on Fuller's testimony, which was frequently contradictory and inconsistent. According to a defense investigator, Fuller admitted lying to police regarding defendant's admission that he assaulted both women.

At the penalty phase, the People admitted evidence of defendant's prior crimes, including four prior felony convictions for robbery, burglary, disorderly conduct (transmitting a false alarm), and theft, and numerous unadjudicated offenses including rapes, oral copulation, robberies, batteries and assaults.

1

2          The defense relied primarily on background and character evidence, including testimony regarding defendant's troubled childhood, his lack of parental guidance, and the likelihood he would succeed in a supervised prison setting.  Defendant personally testified regarding some of the foregoing matters, and attempted to mitigate some of the "prior crimes" evidence by explaining the extenuating circumstances surrounding them.

3

4

5          A defense psychologist, Dr. Fricke, testified regarding defendant's sociopathic personality.  On rebuttal, a prosecution psychiatrist stressed defendant's anti-social and manipulative personality, and his potential dangerousness.

6

7   *Johnson*, 6 Cal. 4th at 14-16.

8

9

10                           **LEGAL FRAMEWORK**

**A.     AEDPA**

11

12          The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28

13   U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody

14   pursuant to a state court judgment, even when the [p]etitioner is not challenging his underlying state

15   court conviction."  *White v. Lambert*, 370 F. 3d 1002, 1009-1010 (9th Cir. 2004).  Under AEDPA,

16   this court may entertain a petition for habeas relief on behalf of a California state inmate "only on

17   the ground that he is in custody in violation of the Constitution or laws or treaties of the United

18   States."  28 U.S.C. § 2254(a).

19          According to AEDPA, the court should not grant a writ of habeas corpus with respect to any

20   claim that was adjudicated on the merits in state court unless the state court's adjudication of the

21   claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

22   clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

23   resulted in a decision that was based on an unreasonable determination of the facts in light of the

24   evidence presented in the State court proceeding."  28 U.S.C § 2254(d).  A federal court must

25   presume the correctness of the state court's factual findings, and the presumption of correctness may

26   only be rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

27

28

**United States District Court**
For the Northern District of California

The "contrary to" and "unreasonable application" clauses of § 2254(d) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court's decision is "contrary to" clearly established United States Supreme Court law if it fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id*. at 413-414. A decision is an "unreasonable application" of United States Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 414.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *See Williams*, 529 U.S. at 412. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark*, 331 F.3d at 1070.

When a federal court is presented with a state court decision that is unaccompanied by a rationale for its conclusions, the court has no basis other than the record "for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such situations, federal courts must conduct an independent review of the record to determine whether the state court

5

decision is objectively unreasonable. *Id.* While federal courts "'are not required to defer to a state court's decision when that court gives [them] nothing to defer to, [they] must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law.'" *Greene v. Lambert*, 288 F.3d 1081, 1089 (9th Cir. 2002) (quoting *Fisher v. Roe*, 263 F.3d 906, 914 (9th Cir. 2001)). Furthermore, independent review of the record is not de novo review of the constitutional issue, but rather the only way a federal court can determine whether a silent state court decision is objectively unreasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, if the state court did not reach the merits of a claim, federal review of the claim is de novo. *Nulph v. Cook*, 333 F.3d 1052, 1057 (9th. Cir. 2003).

Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637, citing *United States v. Lane*, 474 U.S. 438, 439 (1986).

**B.** *Teague*

As amended by AEDPA, 28 U.S.C. 2254(d) codifies and amends the non-retroactivity principle announced in *Teague v. Lane*, 489 U.S. 288, 310-316 (1989). *See Williams v. Taylor*, 529 U.S. 362, 379–380, 412 (2000). This principle prevents a federal court from granting habeas relief to a state prisoner based on a constitutional rule of criminal procedure announced after his conviction and sentence became final. *See Teague*, 489 U.S. at 310–16; *see also Penry v. Lynaugh*, 492 U.S. 302, 313–314 (1989) (the non-retroactivity principle is applicable in a capital sentencing context). It prohibits federal courts from either creating or applying new rules on collateral review.

6

United States District Court

For the Northern District of California

*See Butler v. McKellar*, 494 U.S. 407, 412 (1990). In pertinent part, section 2254(d) provides that no habeas relief may be granted as to any claim that was adjudicated on the merits in state court unless the prior decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. 2254(d)(1). *Teague*'s prohibition against reliance on new rules is the functional equivalent of section 2254(d)'s requirement of reliance on "clearly established law." *Williams*, 529 U.S. at 379, 412. AEDPA has also added the requirement that the "clearly established law" be limited to that "determined by the Supreme Court of the United States." 28 U.S.C. 2254(d)(1). This extends the *Teague* principle "by limiting the source of doctrine on which a federal court may rely in addressing the application for a writ." *Williams*, 529 U.S. at 381–382. Thus, AEDPA codifies *Teague* to the extent that *Teague* requires federal courts to deny relief contingent upon a rule of law that was not clearly established at the time that the state conviction became final. *Id*. at 380.

The *Teague* doctrine nonetheless survives as an independent inquiry from AEDPA. *See Horn v. Banks*, 536 U.S. 266, 272 (2002) (concluding that AEDPA and *Teague* inquiries are distinct). In addition to conducting any analysis under AEDPA, a federal court reviewing a habeas petition must conduct a threshold *Teague* analysis when the matter is properly raised by the state. *Id.*; *see also Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (if the state argues *Teague*, the court must apply it before considering the merits of the claim).

*Teague* instructs that "[a] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301. Put differently, a decision sets forth a new rule when it "breaks new ground or imposes a new obligation on the States or the Federal Government." *Butler*, 494 U.S. at 412. The new rule principle does not, however, foreclose the specific application of a previously established rule. The Supreme Court has explained that "if the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those

applications themselves create a new rule." *Williams*, 529 U.S. at 383 (quoting *Wright v. West*, 505 U.S. 277, 308–309 (1992)).

In determining whether a state prisoner is entitled to habeas relief, a federal court should apply *Teague* by proceeding in three steps. *See Caspari*, 510 U.S. at 390. First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted, and the time for filing a petition for a writ of certiorari has elapsed or a timely-filed petition has been finally decided.

Second, the court must "survey the legal landscape as it then existed" to determine whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he now seeks was then required by the Constitution. *Id.* The inquiry must focus on whether the rule was dictated by precedent, *i.e.*, whether no other interpretation was reasonable. *See Lambrix v. Singletary*, 520 U.S. 518, 538 (1997). The *Teague* doctrine validates reasonable good faith interpretations of existing precedents made by the state courts even if they are shown to be contrary to later decisions. *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). A federal court will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court. *Id.*

Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the non-retroactivity principle. *See Caspari*, 510 U.S. at 390. The first exception is for new rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague*, 489 U.S. at 307 (internal quotations marks omitted). The second exception is for "'watershed rules of criminal procedure' implicating the fundamental fairness and

United States District Court
For the Northern District of California

8

accuracy of the criminal proceeding." *Saffle v. Parks*, 494 U.S. 484, 495 (1990).  The exceptions are

rarely found.  *See, e.g.*, *O'Dell*, 521 U.S. at 167 (a new rule that a capital defendant must be

permitted to inform the jury that he will be parole ineligible if not sentenced to death is not within

the "watershed rules" exception to *Teague*, as it does not alter the understanding of bedrock

procedural elements of a fair trial).[4]

**ANALYSIS**

**A.      Claim F**

In Claim F, petitioner maintains the trial court erred in admitting evidence of his alleged

statement that he had killed before.  Specifically, petitioner challenges the admission of Denise

Lancaster's testimony as irrelevant, inflammatory, prejudicial and unreliable.

The trial court had already excluded evidence of petitioner's rape of Lancaster when the

prosecution moved to introduce petitioner's statement to Lancaster that he had killed before and

could do it again.  Petitioner's counsel opposed introduction of the statement on relevancy and other

grounds.  After a hearing on the matter, the trial court found the testimony relevant and agreed first

to allow Lancaster to testify at an *in limine* court hearing, before deciding whether her testimony

could be presented at trial.

After the court hearing and argument by counsel, the trial court found Lancaster to be

credible, her testimony relevant and that the probative value was not outweighed by its prejudicial

effect.  RT 3886-3888.  The court further ruled that Lancaster could be questioned about her late

reporting of the statement, but that the "thing to be avoided entirely is the reference to rape or

anything that comes close to it."  RT 5439-5440.

---

[4] For the purposes of *Teague* retroactivity analysis, petitioner's judgment became final when
the United States Supreme Court denied certiorari on October 3, 1994.  *See Beard v. Banks*, 542
U.S. 406 (2004).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

At trial, Lancaster testified generally that she encountered petitioner after giving him a ride, and that during a confrontation he threatened to kill her.   RT 5455-5467.  After her initial report, she later recalled that petitioner had said that he had killed before.  RT 5460.  She was cross-examined by petitioner's counsel, who asked her about the marijuana Lancaster admitted smoking with petitioner and about the fact that she had learned of the two homicides petitioner had been accused of before she recalled his specific statement that he had killed before.  RT at 5463-5466.

The California Supreme Court addressed this issue in a reasoned opinion on direct appeal.

> Defendant contends the court erred in allowing witness Denise Lancaster to testify at the guilt phase that defendant had threatened to kill her and had told her he had killed before.  At an *in limine* hearing, Lancaster testified that she had picked up defendant in March 1986 while he was hitchhiking.  (The charged murders occurred in January 1986.)  He raped her, threatened to kill her, and told her he had killed before.  The court ruled that Lancaster could not testify concerning the rape, but could relate the other statements.  At trial, she did so, referring to the rape as a "physical confrontation" with defendant.
>
> Defendant asserts Lancaster's testimony that he had killed before was irrelevant because the statement was not linked to the charged murders. [Citation omitted.] Defendant suggests that admissions of prior criminal conduct unrelated to the charged offenses are inadmissible at the guilt phase, being essentially character evidence barred by Evidence Code section 1102, subdivision (b).
>
> We think that defendant's admission of a prior killing or killings, made soon after the charged murders were committed, was relevant as to the ultimate question of defendant's guilt.  The jury was entitled to infer that defendant was referring to the killing of Castro and Holmes.  The fact that he could have been referring to an unrelated killing goes more to the weight of his statement than to its admissibility.  Moreover, in light of the other evidence of defendant's guilt, outlined above, any error in admitting Lancaster's testimony concerning defendant's admission of a prior killing was harmless.
>
> We note that defendant does not argue the inadmissibility of Lancaster's recital of defendant's threat to kill her.  Although this evidence seemingly would have little relevance to the issue of defendant's guilt, it is at least arguable the threat confirmed defendant's intent or state of mind to kill those who opposed him. [Citation omitted.]   In any event, any error in admitting the statement was undoubtedly harmless in light of the remaining evidence of guilt.

*Johnson*, 6 Cal. 4th at 33-34.

10

**United States District Court**
For the Northern District of California

1  The admission of evidence is not subject to federal habeas review unless a specific

2  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the

3  fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th

4  Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  The

5  Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial

6  evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v.*

7  *Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant

8  pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary

9  

10  to clearly established Federal law under § 2254(d)).

11  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for

12  granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van*

13  *de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests

14  that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial

15  even when state standards are violated; conversely, state procedural and evidentiary rules may

16  countenance processes that do not comport with fundamental fairness.  *See id.* (citing *Perry v.*

17  *Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838 (1984)).  The due process

18  inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial

19  that it rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.

20  1995); *Colley,* 784 F.2d at 990.  Only if there are no permissible inferences that the jury may draw

21  from the evidence can its admission violate due process.  *See Jammal*, 926 F.2d at 920.

22  

23  Here, petitioner cannot demonstrate that the state court's reasoned opinion was contrary to,

24  or an unreasonable application of, clearly established United States Supreme Court law or an

25  unreasonable determination of the facts.  Petitioner argues generally that Lancaster's testimony was

26  improper character evidence, but ackowledges in his pleadings that the admission at issue was

27  unclear.  Petitioner also maintains that Lancaster's testimony was irrelevant, but can cite to no

28

caselaw demonstrating that the state court's determination that the testimony was "relevant as to the ultimate question of defendant's guilt", *Johnson*, 6 Cal. 4th at 34, was an unreasonable application of clearly established federal law.  Given that the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ", *Holley,* 568 F.3d at 1101, even if the testimony *were* irrelevant, petitioner would not be able to succeed on this claim.

Furthermore, petitioner has failed to establish that any purported state court error was prejudicial, *i.e.* that it had a substantial and injurious effect or influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 638.  As the California Supreme Court found, "in light of the other evidence of defendant's guilt . . . any error in admitting Lancaster's testimony concerning defendant's admission of a prior killing was harmless." *Johnson*, 6 Cal. 4th at 34.   For the foregoing reasons, this claim is denied.

**B.      Claim G**

In Claim G, petitioner maintains that admission at trial of various statements he made to the police was unconstitutional because the statements were illegally obtained.  Petitioner was interviewed by police in March and April 1986.  Motions to suppress were brought at the preliminary hearing and again prior to trial.  On August 3, 1987, the trial court granted in part and denied in part petitioner's motion.  There were subsequent proceedings on exclusion to determine which of petitioner's statements were excluded under the August 3, 1987 order.  RT 5374-5433.

The California Supreme Court addressed this claim in a lengthy, reasoned opinion on direct appeal.

C. *Admissibility of Defendant's Statements*

Defendant contends the court erred in admitting certain statements he made to police officers on March 28 and April 3, 1986.  We conclude the statements were

properly admitted, and in any event, any *Miranda* error was harmless beyond a reasonable doubt.

### 1. *March 28 interview*

On March 28, 1986, defendant was interviewed by Officers McCarthy and Keate concerning the murders of Castro and Holmes. Officer McCarthy told defendant the purpose of the interview and defendant replied, "fine." When McCarthy brought out a tape recorder, defendant objected, stating "No tape recording, I don't want to incriminate myself." The recorder was not used.

Officer McCarthy thereupon read defendant his *Miranda* rights (see *Miranda v. Arizona* (1966) 384 U.S. 436, 444-445 [parallel citations omitted]), and defendant confirmed that he understood those rights and wished to talk with the officers. Defendant was also informed he could terminate the interview at any time. The ensuing interview lasted around two and one-half hours. During its course, McCarthy explained that defendant would be charged with the two murders, and defendant (1) bragged that his mother would hire a "high price lawyer out of New York" to defend him, (2) inquired of possible penalties for the murders, and (3) initiated the possibility of a plea bargain.

When informed that he might be charged with offenses carrying the death penalty, defendant stated, "Maybe I ought to talk to a lawyer, you might be bluffing, you might not have enough to charge murder." Officer McCarthy thereupon asked defendant if he wanted to talk to a lawyer at that point, and defendant made no direct reply except to repeat that he thought McCarthy was "bluffing."

Defendant, stating "this is off the record," next asked Officer McCarthy if a 10-year sentence was possible for the murder charges. McCarthy replied that the matter of sentence was up to the district attorney, the court and defendant's counsel. Defendant acknowledged he was worried about receiving a death sentence. (As explained below, the foregoing "off the record" discussion about sentencing was ruled inadmissible.)

Defendant next asked Officer McCarthy to "Tell me what you have and I might make you a proposition." McCarthy replied that he customarily did not disclose evidentiary details. Defendant indicated that he would not "say" anything "without some kind of arrangement." He also declared that "I probably did do it, but you are not going to get me to say I did it." Defendant then asked McCarthy to approach the district attorney and negotiate a 10-year sentence for the murder charges.

### 2. *April 3 interview*

On April 2, Officer Quinn received a phone call from a person identifying himself as "Antonin." (Defendant was also known as Antonin Capriano.) Antonin indicated he was confined at the San Mateo County jail and wished to speak to the officer. Officers Quinn and McCarthy visited defendant and again read him his

13

*Miranda* rights.  Defendant again confirmed he understood these rights and wished to talk with the officers.

At one point in the interview, the officers asked defendant to tell what happened in regard to Castro and Holmes.  Defendant insisted the discussion be "off the record," stating that he was not going to incriminate himself by telling what happened.  He added that he would plead guilty to manslaughter "for two years."  After terminating the interview ("I don't want to say anything else"), he called officers back and told them to see if the district attorney would "go for twenty straight years for the case."

According to the Attorney General, and not disputed by defendant's appellate counsel, *none* of defendant's statements at the April 3 interview was introduced at trial.  Accordingly, it is apparent that defendant could not have been prejudiced by any asserted *Miranda* errors occurring during that interview, and we do not discuss defendant's claims in that regard.

### 3. *Trial court's rulings*

Defendant moved the trial court to suppress his statements, asserting that the interviews continued after he had invoked his rights to remain silent and to consult with any attorney.  The court disagreed, finding that defendant had voluntarily waived those rights and did not reinvoke them.  The court also ruled, however, that in light of defendant's "off the record" assertions during the course of both interviews, any statement immediately following these assertions would be inadmissible.  The affected statement related to possible plea bargains or potential sentences for the murders.

### 4. *Discussion*

As we stated in *People v. Boyer* (1989) 48 Cal. 3d 247, 263 . . . , reviewing a similarly claimed *Miranda* violation, "The scope of our review of constitutional claims of this nature is well established.  We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]"

### a. "*No tape recorder*" remark

Defendant contends that he invoked his right to remain silent at the outset of the March 28 interview by remarking: "No tape recorder.  I don't want to incriminate myself."  The trial court found that this remark was ambiguous and did not necessarily disclose an intent to "cut off" all questions, as opposed to merely expressing an objection to the use of a tape recorder to memorialize defendant's responses.  In the trial court's view, defendant's remarks indicated only a "partial restriction" on his willingness to speak to the officers.  Accordingly, they were entitled to continue the interrogation once they clarified the situation by giving *Miranda* advisements and obtaining defendant's express consent to be interviewed.  We agree.  As indicated previously, the advisements, and defendant's agreement to

14

talk, occurred immediately following his "no tape recorder" remark and clearly confirmed his general willingness to speak to the officers.

Defendant asserts his remarks showed that he was unwilling to "freely and completely" discuss his case with the police. (See *People v. Burton* (1971) 6 Cal. 3d 375, 382; *People v. Randall* (1970) 1 Cal. 3d 948, 956 [parallel citations omitted].) We find the foregoing cases inapposite. They recite the familiar rule that police interrogation must cease once the defendant, by words or conduct, demonstrates a desire to invoke his right to remain silent, or to consult with an attorney. Neither case, however, stands for the proposition that a defendant automatically invokes those rights by imposing conditions (such as "no tape recorder") governing the conduct of the interview.

Defendant contends that prior cases have held a suspect's refusal to permit a tape-recorded interview constitutes an invocation of his right to remain silent. (See *People v. Hinds* (1984) 154 Cal. App. 3d 222, 235-236; *People v. Nicholas* (1980), 112 Cal. App. 3d 249 [parallel citations omitted].) In both these cases, however, the suspect's refusal to permit a recording was accompanied by other facts disclosing his clear intent to speak *privately* and in confidence with the officers. [citations omitted].

In the present case, by contrast, the trial court found no such clear intent on defendant's part. Although defendant asked that the proceedings go "off the record" at various points during the interviews, he expressed no general expectation of privacy covering the entire interview. . . . As another recent case observes, "it was for the trial court to determine whether [the defendant's] refusal to . . . be recorded was in fact an invocation of his right to silence. The court found [the defendant] in fact had understood his rights and waived them, and his conversations with the officers were therefore voluntary. Such a conclusion was reasonable and we will not disturb it on this appeal. [Citations.]" (*People v. Maier* (1991) 226 Cal. App. 3d 1670, 1678.)

Defendant observes that he linked the "no tape recorder" remark with the explanation that "I don't want to incriminate myself," a statement defendant deems an explicit invocation of his self-incrimination privilege. But the trial court reasonably could find that the remark, being linked to defendant's insistence on "no tape recorder," merely expressed his assumption that only recorded statements could incriminate him at trial. Immediately after defendant made this remark, the officers read defendant the *Miranda* advisements and asked defendant if he wished to talk to them. These advisements included the unqualified admonition that *anything* defendant said to the officers could be used against him in a court of law. The trial court reasonably could find that this admonition cleared up any possible misconception defendant previously may have entertained regarding the admissibility of his *unrecorded* statements to the officers.

Several California cases have indicated that if a defendant expresses ambiguous remarks falling short of a clear waiver or invocation of his *Miranda* rights, the officers may continue talking with him for the limited purpose of clarifying whether he is waiving or invoking those rights. (See *People v. Carey* (1986) 183 Cal. App. 3d 99, 103 [additional citations omitted].) We approve the rule of these cases and find it applicable here. Giving defendant full *Miranda* warnings and obtaining

15

his waiver of his *Miranda* rights was a legitimate method of clarifying any ambiguities inherent in defendant's "no tape recorder" remark.

### b. *Defendant's references to securing a lawyer*

Midway during the March 28 interview, Officer McCarthy indicated (as he had already done several times during the interview) that murder charges would be brought against defendant.  He replied that "My mother will put out money for a high price lawyer out of New York."  McCarthy asked for the name of defendant's lawyer, but he refused to furnish it, stating, "I don't want you talking to my lawyer."

Thereafter, following a discussion (initiated by defendant) of the possible penalties that might be imposed for the murders, including death or life without possibility of parole, defendant stated, "Give me a minute, I might tell you something you want to hear."  After a few moments of silence, defendant then said, "Maybe I ought to talk to my lawyer, you might be bluffing, you might not have enough to charge murder."  Officer McCarthy immediately asked defendant if he wanted to talk to a lawyer before answering more questions, and defendant simply repeated that he thought McCarthy was bluffing.  He made no further mention of lawyers during this interview.

Defendant contends that each of the foregoing references to lawyers invoked his right to counsel and should have induced the officers to terminate the interview. The trial court ruled that defendant's initial remark regarding his mother securing a "high price" lawyer was "not an expression of an intent to terminate the interview at that time, but instead related to a future trial and not to present questioning."  We agree.

The cases hold that if a defendant indicates *in any manner* that he wishes to consult with an attorney, the interrogation must cease.  (*Miranda v. Arizona*, *supra*, 384 U.S. at pp. 444-445 [citations omitted.]  The California courts have found invocations of the right to counsel in such varying statements or inquiries as "'I don't know if I should have a lawyer here or what'" (*People v. Russo*, *supra*, 148 Cal. App. 3d at p. 1177), "'Do you think we need an attorney?'" and "'I guess we need a lawyer.'" (*People v. Superior Court (Zolnay)* 15 Cal. 3d 729, 735-736 . . . ), "'Well, maybe I should talk to my attorney, Mr. Corbin'"] (*People v. Munoz*) (9178) 83 Cal. App. 3d 993, 995 . . . ), and "'Tell me the truth, wouldn't it be best if I had an attorney with me?'" (*People v. Hinds*, *supra*, 154 Cal. App. 3d at p. 234.)

Yet we have found no case suggesting that a suspect's statement concerning the possible retention of a lawyer for *future* proceedings would require termination of a police interrogation. . . . In our view, the trial court properly deemed defendant's statement mere bragging about his ability to secure high priced legal representation for future proceedings, and not a request to consult with an attorney during the present interrogation.  This interpretation of defendant's remarks is reinforced by his refusal or inability to give Officer McCarthy the name of his lawyer.

Defendant's second remark, "Maybe I ought to talk to a lawyer," is considerably more troublesome.  The trial court ruled that the word "maybe"

16

rendered the statement equivocal, and that in context the reference to a lawyer was not intended as an invocation of defendant's right to remain silent. Defendant's intent to continue the interview was confirmed by his failure to respond to McCarthy's immediate inquiry as to whether defendant wanted an attorney, and by defendant's subsequent request of McCarthy to "Tell me what you have and I might make you a proposition."

As previously indicated, the courts have found *Miranda* violations despite considerable equivocation by the defendant. We briefly review the apposite decisions.

In *Zolnay*, *supra*, 15 Cal. 3d at page 735, we observed that the suspects's question. "'Do you think we [referring to himself and a codefendant] need an attorney?'" and his statement, "'I guess we need a lawyer,'" were "a direct result of the interrogation. The record discloses that the query interrupted the interrogation at a point when defendants' choice seemed all but limited to confession or silence. Moreover, defendants' subsequent specific request that the deputies recommend an attorney indicates both their continuing concern and their specific and pointed desire to consult counsel. We think the record discloses sufficient indication of their right to remain silent." We stressed in *Zolnay* (*id.* at p. 736) that "'no particular form of words or conduct is necessary'" to invoke the self-incrimination privilege. . . .

The present case is factually distinguishable from *Zolnay*, *supra*, in several respects. Initially, on this record it is highly unlikely that defendant's references to an attorney disclosed his confusion or uncertainty about continuing the interview. A reading of Officer McCarthy's notes of the interrogation reveals that from start to finish defendant maintains a confident, "cocky" attitude, verbally sparring with the officer, expressing doubts about the strength or admissibility of the evidence against him, negotiating with McCarthy for a possible reduced sentence, and bragging about his good looks, his various girlfriends, his ability to produce an alibi for "any date you want," and his mother's ability to hire an expensive lawyer. As McCarthy noted, defendant appeared to "almost relish []his role as the focus of our attention. . . ." Unlike the situation in *Zolnay*, *supra*, defendant never asked the deputies to recommend an attorney, and he declined to respond to McCarthy's attempts to learn his lawyer's name or to determine whether he in fact truly wanted to speak to an attorney.

In *People v. Munoz*, *supra*, 83 Cal. App. 3d 993, the officers took a robbery suspect to an interview room and began to interrogate him. As soon as the interrogating officer introduced himself, the suspect stated, "Well, maybe I should talk to my attorney, Mr. Corbin." Rather than terminate the interview, the officer agreed that the suspect could talk to his attorney, but first the officer wanted to explain what information he had, and what he needed to learn. Eventually, the suspect confessed.

The *Munoz* court, citing our *Zolnay* decision, *supra*, 15 Cal. 3d 729, held that the continued interrogation was improper. The court noted that although the suspect's remark was "ambiguous," it could be construed "as an invocation of his right to speak to an attorney before questioning." (83 Cal. App. 3d at p. 996.) The

17

United States District Court

For the Northern District of California

court also relied on the fact that suspect had mentioned his attorney *by name*, indicating he already had retained counsel.  (*Ibid.*)

. . . .

   *People v. Bestelmeyer, supra*, 166 Cal. App. 3d 520, 527-528, seems more closely on point.  There, after the suspect was arrested for molesting his stepdaughter, the arresting officer gave *Miranda* warnings and commenced an interview.  At the outset, after being told he could terminate the interview at any time, the suspect was asked by one officer what he was thinking.  The suspect replied, "'I was just thinkin', maybe I shouldn't say anything without a layer and then I thinkin' ahh.'" (*Id.* at p. 524.)  The officer continued explaining to the suspect that he could waive his rights, agree to talk to the officers, and then reinvoke his rights and stop talking to them. The suspect made no further references to an attorney, and eventually he made incriminating statements.

   The *Bestelmeyer* court found that the suspect's initial remark was too ambiguous to amount to an invocation of his right to the presence of counsel, and that substantial evidence supported the lower court's finding that the suspect knowingly waived that right.  (166 Cal. App. 3d at pp. 527-528.)

   Turning to the present case, we think that in light of the whole record, including defendant's overall conduct and demeanor during the interrogation, the ambiguous and tentative nature of his reference to any attorney, Officer McCarthy's immediate attempt to clarify defendant's remark, and defendant's refusal to respond thereto, there was substantial evidence to support the trial court's determination that defendant did not invoke his right to counsel.  Accordingly, it is unnecessary to determine whether the asserted *Miranda* error was prejudicial.  (See pt. III. C.4.d., *post*.)

C. *The "off-the-record request*

   As noted above, at one point in the March 28 interview, after Officer McCarthy had assured defendant that he was not "bluffing" about charging defendant with murder, defendant abruptly stated, "This is off the record."  McCarthy replied, "You're doing all the talking, don't let me stop you, go ahead."  Defendant thereupon asked McCarthy, "Can you get me 10 years?"  The ensuing discussion concerned possible penalties that might be imposed. (All of these "sentencing" discussions were excluded at trial.)  Soon thereafter, defendant asked McCarthy, "Tell me what you have and I might make you a proposition."  After McCarthy falsely told defendant that McCarthy knew that defendant had pawned some of the victims' jewelry, and that victim Holmes had identified defendant before she died, defendant stated that his name was not on any pawn slip, that it would be his word against the pawnshop owner, and that a dying declaration from victim Holmes "would convict me of killing her . . . but not [victim Castro], but it's close in time, but I am not saying I did it. [¶] . . . I probably did do it, but you are not going to get me to say I did do it."  (This latter statement was introduced at trial.)

United States District Court

For the Northern District of California

1   Immediately thereafter, defendant again said, "This is off the record," and
2   McCarthy told him to go ahead.  Defendant then directed McCarthy to go to the
    district attorney and "get me ten straight . . . years, and I will give you something you
3   want."  The remaining discussion concerned possible arrangements for reduced
    sentences in return for defendant's statement about the murders.
4
5   The trial court found that defendant's "off the record" requests pertained only
    to the sentencing and plea bargain discussions which immediately followed those
6   requests, and that accordingly any statements not pertaining to sentencing were
    admissible.  The court ruled that only the sentencing discussions would be
7   inadmissible at trial.

8   Defendant contends that all statements following his initial "off-the-record"
    request should have been suppressed, because McCarthy never informed him that the
9   interview was no longer "off the record."  He cites no cases imposing such a rigid
    requirement, and we have found none so holding.  The main inquiry should be
10  whether defendant knowingly and intelligently waived his right to remain silent.
    Here, the trial court found the waiver remained valid as to discussions not involving
11  sentencing.  (See *People v. Silva* (1988) 45 Cal. 3d 604, 629-630 [parallel citation
    omitted] [suspect's refusal to discuss certain subjects not conclusive indication of
12  intent to terminate interrogation]; *People v. Hayes* (1985) 38 Cal. 3d 780, 784-786
    [parallel citation omitted] [defendant's expressed reluctance to discuss "details" of
13  confession did not invoke *Miranda* right to silence]. . . . We find the record amply
    supports the trial court's finding.  It seems unlikely defendant would have repeated
14  his "off-the-record" request if he had intended or assumed the proceedings remained
15  off the record following his initial request.

16  It could be argued that defendant's request that the interview proceed "off the
    record" disclosed his confusion about the admissibility of his statements to the
17  officers, thereby vitiating the *Miranda* waiver.  In *People v. Braeseke, supra*, 25 Cal.
    3d at pages 702-703, we held that a defendant's "off-the-record" request, acceded to
18  by the officers, was inconsistent with a knowing waiver of self-incrimination rights.
    As we stated in that case, "defendant's request revealed a marked lack of
19  understanding of the *Miranda* warnings. [Citation and fn. omitted.]."  (See also
    *Frazier v. United States* (D.C. Cir. 1969) 419 F.2d 1161, 1168-1169 . . . [officers'
20  obligation to clarify the defendant's misconception regarding admissibility of oral
21  admissions].)

22  *Braeseke, supra*, 25 Cal. 3d 691, is distinguishable, however, because there
    the trial court permitted admission of the defendant's statements despite his request
23  for "off-the-record treatment."  In the present case, as we have indicated, the trial
    court *excluded* those statements regarding possible sentencing to which the off-the-
24  record request was directed.  Moreover, it is arguable that an "off-the-record" request
    no longer necessarily demonstrates confusion on the defendant's part because,
25  following *Braeseke*, such a request effectively insulates the affected portion of the
    interview from subsequent courtroom use.  As with defendant's statement that
26  "maybe I ought to talk to a lawyer," because we find no *Miranda* violation in
    connection with defendant's "off the record" remark, it is unnecessary to determine
27  the prejudicial effect of such error.  Nonetheless, because it seems apparent that no
28

19

prejudice resulted from any such violation, we address that subject briefly, as follows:

### d. *Prejudice*

The principal inculpatory statement made by defendant after he indicated he "maybe" needed counsel and requested "off-the-record" treatment was his statement that "I probably did do it [kill victim Castro], but you are not going to get me to say I did do it." The prosecutor emphasized this statement in his closing argument to the jury. The statement, though somewhat softened by the word "probably," nonetheless reasonably could be viewed as a confession or admission of guilt. We note, however, that (as disclosed to the jury) during the same interview defendant repeatedly denied his guilt of either murder. In context, the jury could have viewed defendant's "probably guilty" remark as more of a taunt to the interrogating officer than an outright admission of guilt.

Under federal law, the test for prejudice for admitting a *coerced* confession is the *Chapman* test, requiring reversal unless the error was harmless beyond a reasonable doubt. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 309 [parallel citation omitted]; *Chapman v. California* (1967) 386 U.S. 18, 24 [parallel citation omitted].) Presumably, the federal courts would apply the same test to a confession adduced in violation of *Miranda*. Similarly, under state law, we recently rejected a per se reversible error standard for coerced confessions, concluding that a conviction may be affirmed despite the erroneous admission of an involuntary confession, when the record shows that the admission of the confession was harmless beyond a reasonable doubt. (See *People v. Cahill* (1993) 5 Cal. 4th 478, 509-510 [parallel citation omitted].)

Was any *Miranda* error in this case harmless beyond a reasonable doubt? On this record, we believe it was. Defendant, before suggesting that he "maybe" should see his lawyer, and before asking to go "off the record," admitted to Officer McCarthy that he knew Castro and had visited her on or about the night of the murders. According to defendant, on the last such visit, he drove Castro's children to a babysitter, had "sex" with her and drank with her until be became intoxicated and fell asleep. Her mother, victim Holmes, called from downstairs to inquire of Castro, and defendant told her Castro was asleep. All this evidence of defendant's involvement with the two victims on or about the night they were murdered was seemingly untainted by defendant's subsequent claimed invocations of his *Miranda* rights.

In addition, defendant's girlfriend, Roshaun Fuller, testified at trial that defendant had admitted to her that he "knocked out" victim Castro, "hit" victim Holmes on the back of her head, and thereafter stole $200 and a ziploc bag of heavy gold jewelry from them. Other witnesses placed defendant with Castro on or about the night of the murders, and later observed him wearing expensive gold jewelry and new clothes.

Significantly, other than pointing to flaws and inconsistencies in witness Fuller's testimony, the defense failed to rebut the foregoing evidence or to raise any

United States District Court

For the Northern District of California

1
2
3

credible defenses to the murder charges.  In light of the strong incriminating evidence that was properly admitted at trial, we conclude that admission of defendant's equivocal statement that he "probably did it" was harmless beyond a reasonable doubt.

4

*Johnson*, 6 Cal. 4th at 23-33.

5
6
7
8
9
10
11
12

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence.  *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts.  *See id.* at 443-445.  The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d).  *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

13
14
15
16
17
18
19
20
21

Petitioner argues in part that the state court's opinion was unreasonable because it relied primarily on state precedent involving *Miranda*.  Petitioner is mistaken.  The Supreme Court has made clear that as long as the reasoning of the state court does not contradict Supreme Court precedent, AEDPA's deferential standard applies.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (qualification for AEDPA deference requires neither citation to United States Supreme Court cases nor awareness of them, as long as neither the reasoning nor the result of the state court decision contradicts them).  Thus, the state court's reliance on state court precedents does not automatically deem it unreasonable under AEDPA.

22
23
24
25

Petitioner also maintains that, even if the state court's reasoned opinion is entitled to deference, the opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law.   Petitioner also argues that the state court's opinion was based on an unreasonable determination of the facts.

26
27
28

To begin with, petitioner argues that he was attempting to assert his rights against incrimination and to terminate questioning when he told McCarthy "no tape recorder – I don't want

United States District Court
For the Northern District of California

1 to incriminate myself."  According to petitioner, even though he was read his *Miranda* rights after

2 this statement, he did not knowingly and intelligently waive his right to remain silent, and was

3 operating under the belief that by giving an untaped statement, he would not be incriminating

4 himself.

5 Once properly advised of his rights, an accused may waive them voluntarily, knowingly and

6 intelligently.  *See Miranda*, 384 U.S. at 475.  The distinction between a claim that a *Miranda* waiver

7 was not voluntary, and a claim that such waiver was not knowing and intelligent is important.  *Cox*

8 *v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008).   The voluntariness component turns on the absence

9 of police overreaching, *i.e.,* external factors, whereas the cognitive component depends upon the

10 defendant's mental capacity.  *Id.*

11

12 A valid waiver of *Miranda* rights depends upon the totality of the circumstances, including

13 the background, experience and conduct of the defendant.  *See United States v. Bernard S.*, 795 F.2d

14 749, 751 (9th Cir. 1986).  The government must prove waiver by a preponderance of the evidence.

15 *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986); *Lego v. Twomey*, 404 U.S. 477, 488-89

16 (1972); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1180 (9th Cir. 1990).[5]  The waiver need not be

17 express as long as the totality of the circumstances indicates that the waiver was knowing and

18 voluntary.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Juan H.*, 408 F.3d at 1271.  To

19 satisfy its burden, the government must introduce sufficient evidence to establish that under the

20 totality of the circumstances, the defendant was aware of "the nature of the right being abandoned

21 and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

22 A showing that the defendant knew his rights generally is sufficient to establish that he

23 knowingly and intelligently waived them.  *See, e.g., Sechrest v. Ignacio*, 549 F.3d 789, 805-806 (9th

24 Cir. 2008) (finding petitioner's waiver knowing and voluntary where officer's questions to petitioner

25

26

27

28 [5]To solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor
ask explicitly whether the defendant intends to waive his rights.  *See Terrovona*, 912 F.2d at 1179.

22

after petitioner was read his *Miranda* rights were requests for clarification of petitioner's unclear statements regarding his desire to speak to police); *Paulino v. Castro*, 371 F.3d 1083, 1086-1087 (9th Cir. 2004) (statement that suspect understood his rights and wanted to talk to officer sufficient to waive right to counsel); *United States v. Doe*, 60 F.3d 544, 546 (9th Cir. 1995) (officer's unrebutted testimony established by preponderance of evidence that juvenile knowingly and voluntarily waived his *Miranda* rights); *United States v. Rodriguez-Rodriguez*, 364 F.3d 1142, 1146 (9th Cir. 2004) (suspect suffering from mild or moderate heroin withdrawal who was "coherent and responsive" voluntarily waived his *Miranda* rights after they were read to him in English and Spanish).  And although the burden is on the government to prove voluntariness, a waiver cannot be held involuntary absent official compulsion or coercion.  *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir. 1988).  *See generally Derrick v. Peterson*, 924 F.2d 813, 820-24 (9th Cir. 1990) (explaining waiver analysis in detail).

Here, petitioner cannot demonstrate that the California Supreme Court's reasoned opinion was contrary to, or an unreasonable application of, the clearly established federal law detailed *supra*. Nor can he demonstrate that the opinion was based on an unreasonable determination of the facts. As petitioner acknowledges, he was read his *Miranda* rights immediately after he made his "no tape recorder" comment.  Petitioner does not dispute that the *Miranda* rights included an advisement that anything he said could be used against him in a court of law.   As the state court concluded, "[g]iving [petitioner] full *Miranda* warnings and obtaining his waiver of his *Miranda* rights was a legitimate method of clarifying any ambiguities inherent in defendant's "no tape recorder" remark. *Johnson*, 6 Cal. 4th at 27.   Because a showing that a defendant knew his rights generally is sufficient to establish that he knowingly and intelligently waived them, *see, e.g., Sechrest*  549 F.3d at 805-806, this portion of petitioner's claim must be denied.

Petitioner also argues that his "off the record" requests indicate that he did not knowingly and intelligently waive his *Miranda* rights, and that he was unaware that the statements he made

United States District Court

For the Northern District of California

could incriminate him.  The trial court decided that petitioner's "off the record" requests pertained to the sentencing and plea bargaining discussions that followed those requests, and ruled that those particular statements were not admissible.  To the extent petitioner is arguing that additional statements ought to have been suppressed, his argument must fail.  As before, petitioner cannot demonstrate that the California Supreme Court's reasoned opinion regarding this issue was contrary to, or an unreasonable application of, clearly established federal law, nor that it was a based on an unreasonable determination of the facts.  *Johnson*, 6 Cal. 4th at 30-32.

Petitioner also maintains that his statements referring to securing a lawyer indicated a request for an attorney and should have resulted in the officer terminating any questioning.  According to petitioner, the state court's reasoned decision that defendant did not invoke his right to counsel was in error.  *See Johnson*, 6 Cal. 4th at 27-30.

A suspect who has expressed a desire to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to him, unless the suspect himself initiates further communication with the police.  *See Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981); *Taylor v. Maddox*, 366 F.3d 992, 1014-1015 (9th Cir. 2004) (advisement of *Miranda* warnings at beginning of interrogation of no consequence where petitioner requested to speak to attorney prior to start of questioning); *Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999) (suspect's repeated questions about the immediate availability of an attorney constituted an unequivocal request for counsel).  Continued responses to questions from interrogators after a suspect invokes his right to have counsel present does not constitute a waiver of the right.  *See Edwards*, 451 U.S. at 484-85; *Alvarez*, 185 F.3d at 998.

Authorities may, however, interrogate a suspect if the suspect does not clearly request an attorney.  *See Davis v. United States*, 512 U.S. 452, 459-62 (1994) (suspect must unambiguously request counsel; "Maybe I should talk to a lawyer" insufficient); *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008) (suspect's mention of an attorney and reference to advice from attorney that

United States District Court

For the Northern District of California

1  suspect "keep his mouth shut" was not unambiguous request for counsel); *United States v. Younger*,

2  398 F.3d 1179, 1187 (9th Cir. 2005) (defendant's statement "[b]ut, excuse me, if I am right, I can

3  have a lawyer present through all this, right?" does not constitute unambiguous invocation of right to

4  counsel); *Paulino v. Castro*, 371 F.3d 1083, 1087-88 (9th Cir. 2004) (state courts' holding that

5  "Where's my attorney?" and "You mean it's gonna take him long to come?," plus failure to fill in

6  item on waiver form asking whether suspect wishes to give up right to counsel, was not unequivocal

7  demand for counsel not unreasonable under AEDPA standard); *Clark v. Murphy*, 331 F.3d 1062,

8  1070 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003)  (holding that state court's conclusion that "I think

9  I would like to talk to a lawyer" and "should I be telling you, or should I talk to an attorney?" were

10  not unambiguous requests for counsel was not objectively unreasonable application of *Davis*).[6]

11  

12         Petitioner cannot demonstrate that the California Supreme Court's reasoned opinion was

13  contrary to, or an unreasonable application of, the clearly established federal law detailed *supra*.

14  Nor can he demonstrate that the opinion was based on an unreasonable determination of the facts.

15  As Supreme Court and Ninth Circuit caselaw confirms, a suspect must unambiguously request

16  counsel in order for questioning to cease.  *Davis*, 512 U.S. 452, 459-462.  In this case, the state

17  court's decision that petitioner's statements were "ambiguous and tentative" was not unreasonable in

18  light of the record and the applicable caselaw.  *Johnson*, 6 Cal. 4th at 30.  In *Clark*, the Ninth Circuit

19  held that a state court's conclusion that statements such as "I think I would like to talk to a lawyer"

20  and "should I be telling you, or should I talk to an attorney?" were not unambiguous requests for

21  counsel was not objectively unreasonable under AEDPA.  The same is true here.  Petitioner's

22  statements, including his reference to his mother hiring a lawyer, were not unambiguous requests for

23  counsel.  Furthermore, even though officers are not required to clarify ambiguous statements

24  regarding counsel, *Davis*, 512 U.S. at 461-462, petitioner "declined to respond to McCarthy's

25  

_____

26  [6]Officers are not required to clarify ambiguous statements regarding counsel.  *See Davis*, 512
   U.S. at 461-462.

25

attempts to learn his lawyer's name or to determine whether he in fact truly wanted to talk to an

attorney." *Johnson*, 6 Cal. 4th at 29.  Under such circumstances and given the applicable caselaw,

this portion of petitioner's claim must be denied.

Finally, petitioner disputes the California Supreme Court's decision that even had the

statements been admitted in error, there was no prejudice under *Chapman* to petitioner as a result.

*Johnson*, 6 Cal. 4th at 32-33.  This court, because it has already found that the state court's decision

that there were no errors was not unreasonable under AEDPA, is not obligated to address

petitioner's arguments regarding prejudice.  Nonetheless, it will do so.

The United States Supreme Court has held that, when a state court finds a constitutional error

harmless under *Chapman*, a federal court may not grant habeas relief unless the state court "applied

harmless-error review in an objectively unreasonable manner."  *Mitchell v. Esparza*, 540 U.S. 12,

18-19 (2003) (citations omitted).  As the lengthy excerpt, *supra*, makes clear, the California

Supreme Court carefully applied the applicable *Chapman* standard, and petitioner cannot

demonstrate that the court's analysis was objectively unreasonable under the applicable law.  The

state court did not summarily decide that any theoretical errors regarding the admissibility of

petitioner's statements were harmless.  Rather, the court examined the other incriminating evidence

presented at trial before finding harmless error.  *Johnson*, 6 Cal. 4th at 32-33.  As such, it was not

"objectively unreasonable" for the California Supreme Court to conclude that any theoretical error

regarding the admission of defendant's statements was harmless.  Accordingly, this claim must be

denied.

## C.     Claim H

In Claim H, petitioner maintains that there was insufficient evidence to support a first degree

felony murder conviction based on burglary.  According to petitioner, no rational trier of fact could

have found the essential elements of felony murder based on burglary beyond a reasonable doubt,

and thus his conviction must be overturned under *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979).

The California Supreme Court addressed this claim in a reasoned opinion on direct appeal.

As previously indicated, the jury found defendant guilty of two counts of first degree murder. The murder charges against defendant alleged both premeditated murder and felony murder. To establish the latter, the People attempted to prove defendant committed an underlying burglary . . . based in part on his possession of jewelry recently stolen from the victims. (The People also attempted to prove an underlying rape was committed . . . .) Objecting to any instructions on the offense of burglary, the defense noted the absence of evidence indicating defendant entered the victim's home with the intent to steal the jewelry.

The trial court nonetheless instructed the jury regarding the crime of burglary, and additionally instructed, based on CALJIC No. 2.15 (5th ed. 1988), as follows:

"Conscious possession of recently stolen property is not in and of itself sufficient to permit an inference that the defendant committed the crime of burglary. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this evidence need only be slight and need not in and of itself be sufficient to warrant an inference of guilt. As corroboration you may consider the attributes of possession – time, place and manner, that the defendant has an opportunity to commit the crime charged, the defendant's conduct, his false or contradictory statements, if any, or other statements he may have made with reference to the property, and any other evidence which tends to connect the defendant with the crime charged."

Defendant now raises a variety of claims of error arising from giving the foregoing instruction. We find no merit in any of them.

1. *Evidence of burglary*

First, defendant asserts the instruction was improper because there was insufficient evidence a burglary had in fact occurred. [Citation omitted.] He contends evidence was lacking regarding his intent to steal at the time he entered the victims' home. . . . We disagree.

Examination of the record indicates that there was sufficient circumstantial evidence of a burglary, and of defendant's intent to steal the victims' jewelry when he entered the victims' home. (See *People v. Earl* (1973) 29 Cal. App. 3d 894, 896-898 . . . [circumstantial evidence routinely used to establish intent to steal].) Defendant admitted to the officers he was aware the victims possessed gold jewelry, and also that he was present at their home on or about the date of the murders. Substantial amounts of gold jewelry were missing from the premises. Defendant was later seen wearing gold rings, bracelets and necklaces, and was also seen pawning some gold

jewelry (although this jewelry could not be positively traced to the victims).  He told Roshaun Fuller that he assaulted and "robbed" both victims after ransacking their rooms and taking their jewelry.  He also told Fuller that he made his living by taking property from women.  Additionally, he told an acquaintance, Constance Smith, prior to the murders that he was not romantically interested in victim Castro, but simply looked on her as someone from whom he could obtain money.

We conclude, in light of the foregoing record, there was sufficient evidence of a burglary, including a preexisting intent to steal.  Accordingly, the court did not err in giving CALJIC No. 2.15.

*Johnson*, 6 Cal. 4th at 35-36.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324; *see, e.g., Brown v. Farwell*, 525 F.3d 787, 797-798 (9th Cir. 2008) (writ granted where the exclusion of DNA expert's inaccurate and unreliable testimony on DNA evidence would render all other evidence insufficient to convict defendant of sexual assault of a nine-year-old girl).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *See id.* (quoting *Jackson*, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  *See Jackson*, 443 U.S. at 324; *Brown*, 525 F.3d at 794.

On habeas review, a federal court evaluating the evidence under *In re Winship* and *Jackson v. Virginia* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-1347 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Here, petitioner cannot demonstrate that the California Supreme Court's reasoned opinion was contrary to, or an unreasonable application of, clearly established federal law. Nor can he show that the opinion was based on an unreasonable determination of the facts. As the state court detailed, and as a review of the record confirms, there was substantial circumstantial evidence that petitioner committed a burglary with the requisite intent. The evidence supports an inference that petitioner went to Castro's home with the intent to take her jewelry without her permission and against her will. Accordingly, this court finds that "'after viewing the evidence in the light most favorable to the prosecution, a[] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).

Finally, even if petitioner had demonstrated trial error, he would not be entitled to relief because he cannot demonstrate that any error was prejudicial, *i.e.* that it had a substantial and

29

injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 638. As petitioner acknowledges, the prosecution had an additional viable theory (premeditated murder) for culpability for first degree murder.[7] Even if evidence is insufficient to support an alternative theory of liability, due process is not violated so long as the verdict is legally supportable as to at least one of its grounds. *Griffin v. United States*, 502 U.S. 46, 59 (1991). Thus, unless petitioner were able to demonstrate that this additional theory was in error, even if there was insufficient evidence of burglary, he would not be able to demonstrate prejudice as a result. Accordingly, petitioner's claim must be denied.

**D.      Claim I**

In Claim I, petitioner claims that there was insufficient evidence to support a felony murder conviction based on rape. According to petitioner, no rational trier of fact could have found the essential elements of felony murder based on rape beyond a reasonable doubt, and thus his conviction must be overturned under *Jackson*, 443 U.S. at 318-319.

The claim was addressed by the California Supreme Court in a reasoned opinion on direct appeal. The California Supreme Court agreed with petitioner that there was insufficient evidence of rape, but found that the insufficiency of evidence on this particular theory of murder was harmless based on the valid alternative theories of premeditated murder and felony murder presented to the jury. *Johnson*, 6 Cal. 4th at 38-42. The court stated in pertinent part:

> [T]he prosecution's felony-murder theory soundly rested on proof that both murders occurred during the course of a *burglary*. Moreover, defendant has not challenged the legal or evidentiary support for the prosecution's premeditated murder theory. Finally, the record shows that in closing argument the prosecutor conceded to the jury that "This [Holmes's murder] was probably not a felony murder during the course of a rape," but instead was premeditated murder. Defense counsel gratefully exploited the concession in his own closing argument.

---

[7] The prosecution also presented a third theory for first degree murder: felony murder based on rape or attempted rape. As discussed *infra* in Claim I, the California Supreme Court found that there was insufficient evidence of rape to support a conviction on that ground.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1       Accordingly, we may apply the rule that if one of the prosecution's alternative
theories of criminal liability is found unsupported by the evidence, the judgment of
2 conviction may rest on any legally sufficient theory unaffected by the error, unless
the record affirmatively demonstrates that the jury relied on the unsupported ground.
3 (See *Griffin v. United States, supra,* . . . .)  Based on our review of the record, we
conclude that the insufficiency of evidence supporting a rape/murder theory as to
4 victim Holmes was harmless under the circumstances here.

5 *Johnson*, 6 Cal. 4th at 42.

6       Petitioner cannot demonstrate that the state court's decision that any error was harmless was

7 contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable

8 determination of the facts.  Petitioner maintains that the error was prejudicial, because evidence

9 supporting two of the three prosecution theories of first-degree murder liability (felony murder based

10 on burglary and felony murder based on rape) was insufficient.  To begin with, as discussed in detail

11 *supra*, there was sufficient evidence to support guilt under a felony murder based on burglary theory.

12 In addition, petitioner does not maintain that there was insufficient evidence to support the

13 prosecutor's theory of first degree premeditated murder.   The United States Supreme Court has held

14 that due process is not violated so long as the verdict is legally supportable as to at least one of its

15 grounds.  *Griffin*, 502 U.S. at 59.  Here, the verdict is legally supportable as to two grounds, and thus

16 the insufficiency of the evidence as to the felony murder based on rape theory is not reversible error.

17       To the extent petitioner is arguing that he is entitled to a verdict by a jury unanimous as to a

18 particular theory of first degree murder, his argument must fail.  Petitioner does not cite to any

19 caselaw in support of this argument.[8]   In addition, the Ninth Circuit has held that California law

20 does not require that individual jurors choose a particular theory of murder so long as each is

---

[8] Respondent also argues that Claim I is barred by *Teague* because there is no clearly
established precedent holding that the constitution requires that a jury must unanimously decide on
the theory underlying a conviction for first degree murder.  Petitioner does not effectively rebut
respondent's specific *Teague* argument, nor does he cite to any cases requiring that all jurors must
unanimously decide on a particular theory underlying a conviction for first degree murder  As
respondent has pointed out, the existing caselaw is to the contrary.   For this court to grant relief on
this claim, it would be creating a new rule in violation of *Teague*.

      Claim I, therefore, is also barred by *Teague*.  Moreover, this claim does not warrant the
application of either of the two exceptions to *Teague*.

1    convinced beyond a reasonable doubt that the defendant is guilty of murder.  *Santamaria v.*

2    *Horsley*, 133 F.3d 1242, 1246 (9th Cir. 1998) (en banc).  Because petitioner has failed to demonstrate

3    that the state court's reasoned opinion was contrary to, or an unreasonable application of, clearly

4    established United States Supreme Court law or an unreasonable determination of the facts, his

5    claim must fail.

6

7

8    **E.    Claim J**

9          In Claim J, petitioner maintains that the trial court's burglary instructions were

10   unconstitutional.  Specifically, petitioner maintains that the instructions created impermissible

11   inferences and lightened the prosecution's burden of proof, in violation of petitioner's constitutional

12   right to due process.

13         This claim was addressed by the California Supreme Court in a reasoned opinion on direct

14   appeal.

15

16         Defendant asserts that CALJIC No. 2.15[9] created an improper *presumption* of
     burglary arising from the mere fact of possession of stolen property.  But the
     instruction does not so state.  Indeed, it relates a contrary presumption: a burglary

17   may not be presumed from mere possession unless the commission of the offense is
     corroborated.  (Defendant suggests the instruction allows corroboration merely by

18   evidence of the charged offense of *murder*, but we think it clear that, read in context,
     the instruction requires corroboration of the underlying burglary, and not the murder

19   itself.)  Moreover, as the People observe, the ultimate question whether a burglary
     occurred, and the subsidiary question whether defendant possessed the requisite preexisting intent t

20   of that offense.  Thus, contrary to defendant's assumption, CALJIC No. 2.15 did not remove the

21   issue of intent from the jury's consideration. . . .

22         Defendant nonetheless contends that CALJIC No. 2.15 is a "permissive
     presumption" of a kind justified only if the evidence is "sufficient for a rational juror

23   to find the inferred fact beyond a reasonable doubt. . . ." (*Barnes v. United States*
     (1973) 412 U.S. 837, 843, . . . .)  Defendant further notes that constitutional principles

24   require a rational connection between the proved facts and the presumed fact.  (E.g.,
     *Ulster County Court v. Allen* (1979) . . . .)  Assuming the challenged instruction

25   amounts to a presumption of burglary based on defendant's possession of recently
     stolen property, we think the evidence summarized above [referring to the evidence

26   discussed *supra* in Claim H] amply meets the standard set forth in *Barnes* and *Ulster*.

27

     _____

28        [9] The instruction in dispute is detailed at *Johnson,* 6Cal. 4th at 35-36.

1

2

> Similarly, for the reasons above set forth, we must reject defendant's related contention that his murder convictions must be reversed on the ground of insufficient evidence of burglary as the underlying felony.

3

4

5

6

> Having concluded that the court did not err in giving CALJIC 2.15, we need not address defendant's further contentions that the purported error was reversible per se, and that the error cannot be rendered harmless by reliance on the prosecution's alternative theories of premeditated murder or rape/murder (see *Griffin v. United States* (1991) . . . ).

7

*Johnson*, 6 Cal. 4th at 37-38.

8

9

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

10

ailing instruction by itself so infected the entire trial that the resulting conviction violates due

process. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147

11

(1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not

12

13

merely that the instruction is undesirable, erroneous or even "universally condemned," but that it

violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but

14

15

must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502

U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall

16

17

charge to the jury and as a component of the entire trial process.  *United States v. Frady*, 456 U.S.

152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843

18

19

F.2d 314, 317 (9th Cir.1988); *see, e.g., Middleton v. McNeil*, 541 U.S. 433, 434-435 (2004) (per

20

curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-

21

defense defining "imminent peril" where three other instructions correctly stated the law); *Mayfield*

22

*v. Woodford*, 270 F.3d 915, 922-924 (9th Cir. 2001) (no error where court allowed the jury to

23

consider "such guilt phase instructions as it found applicable" for the penalty phase (raising

24

concerns that they would rely on instructions precluding consideration of mitigating factors) because

25

when viewed as a whole, the instructions required the jurors to consider all relevant mitigating

26

evidence for the penalty phase) .

27

28

33

United States District Court

For the Northern District of California

An instruction that, as here, creates a permissive inference does not shift the burden of proof, and will not violate due process unless it cannot be said "'with substantial assurance'" that the inferred fact is "'more likely than not to flow from the proved fact on which it is made to depend.'" *County Court of Ulster County v. Allen*, 442 U.S. 140, 167 & n.28 (1979) (quoting *Leary v. United States*, 395 U.S. 6, 36 (1969)).  Courts "determine the constitutionality of a permissive inference instruction on a case-by-case basis" by reviewing the record evidence to see if the court can say with substantial assurance that the inferred fact flows more probably than not from the facts proven in the particular case.  *See, e.g., Ulster County*, 442 U.S. at 162-167 (finding instruction constitutional only after concluding that inference more probably than not flowed from specific facts proven to jury at trial).

Petitioner argues that while the California Supreme Court identified the correct legal principles, it unreasonably applied those principles to the facts of his case.  Specifically, petitioner maintains that the state court did not recognize that CALJIC 2.15 allowed the jury to find that petitioner committed a burglary based on a finding that petitioner possessed stolen property.

Petitioner is incorrect.   He first argues that the evidence that petitioner committed a burglary or possessed recently stolen property belonging to the victims was incredibly weak.  As discussed in detail *supra*, the state court's decision that there was sufficient evidence of burglary was not in error.

The evidence of possession of stolen jewelry was also addressed by the California Supreme Court.

> As previously noted, . . . an unqualified instruction based on CALJIC No. 2.15 should not be given if the defendant's possession of the stolen property is unclear or in dispute. . . . Defendant asserts that the prosecution introduced no evidence establishing that he possessed any of the victim's jewelry.  We disagree.
>
> Several witnesses described in detail various items of the victims' missing jewelry, including a large "coin-type" medallion worn by victim Holmes.  Witness Constance Smith testified that this medallion could have been the same one she saw defendant wearing following the murders.  As previously noted, defendant was seen wearing gold rings, bracelets and necklaces, and was also seen pawning some gold jewelry.  He told Roshaun Fuller that he assaulted and "robbed" both victims after

United States District Court

For the Northern District of California

1  
2  
ransacking their rooms and taking their jewelry.  We conclude the record contains sufficient evidence of possession of stolen property to justify the instruction.

3  
*Johnson*, 6 Cal. 4th at 36-37.

4  
While petitioner may disagree with the state court's conclusion, he cannot demonstrate that

5  
the state court's reasoned decision was contrary to, or an unreasonable application of, clearly

6  
established federal law.  Nor can he demonstrate that the decision was based on an unreasonable

7  
determination of the facts.    *See* 28 U.S.C. § 2254(d).   The California Supreme Court carefully

8  
examined the instruction and the record evidence of the case, and found that there was no

9  
constitutional error under *Barnes v. United States* 412 U.S. 837, 843 (1973) or *Ulster County v.*

10  
*Allen*, 442 U.S. 140 (1979).  Significant evidence, from more than one witness, was proffered to

11  
demonstrate both petitioner's possession of stolen jewelry and the crime of burglary, including the

12  
intent to steal at the time petitioner entered the victims' home.  Based on this evidence, the state

13  
court reasonably concluded that the inferred fact flowed more probably than not from the facts

14  
proven in this particular case.  *See, e.g., Ulster County*, 442 U.S. at 162-167.  This court also notes

15  
that, given that the California Supreme Court *did* find that there was insufficient evidence of rape, it

16  
is clear that the state court did not automatically conclude that the state had proffered sufficient

17  
evidence on every disputed claim, but rather closely examined the underlying record.

18  

19  
Finally, even if petitioner had demonstrated trial error, he would not be entitled to relief

20  
because he cannot demonstrate that any error was prejudicial, *i.e.* that it had a substantial and

21  
injurious effect or influence in determining the jury's verdict.  *See Brecht*, 507 U.S. at 638.

22  
Accordingly, petitioner's claim must be denied.

23  

24  

25  
**F.    Claim K**

26  
In Claim K, petitioner alleges that the trial court unconstitutionally failed to instruct the jury

27  
on the lesser included offense of second degree murder based on provocation.  While the jury was

28  

35

instructed on second degree murder and voluntary manslaughter, it was not specifically instructed

that sufficient provocation could reduce first degree murder to second degree murder.

The California Supreme Court addressed this claim in a reasoned opinion on direct appeal.

Defendant next contends the trial court erred in failing to instruct sua sponte, based on CALJIC No. 8.73, that the jury, in deciding whether defendant could be found guilty of second degree murder of victim Castro, could consider evidence of any provocation that played a part in inducing the homicide, even if that evidence was insufficient to reduce the offense to manslaughter. The record discloses that the court instructed the jurors generally on the subject of second degree murder, telling them that such a finding would be appropriate if the killing was intentional, and was committed with malice aforethought, but was neither premeditated nor deliberate.

At counsel's request, the court also instructed that provocation could reduce the offense involving victim Castro to *voluntary manslaughter*. (The court found no substantial evidence of provocation as to victim Holmes, and declined to so instruct as to her death.)

As defendant observes, a sua sponte instruction on provocation and second degree murder must be given "where the evidence of provocation would justify a jury determination that the accused had formed the intent to kill as a direct response to the provocation and had acted immediately" to carry it out. (*People v. Wickersham* (1982) 32 Cal. 3d 307, 329 . . . .) *Wickersham* noted that "the fact that heated words were exchanged or a physical struggle took place between the victim and the accused before the fatality may be sufficient to raise a reasonable doubt" as to premeditation. (*Ibid.*) Defendant argues that because the trial court apparently found sufficient evidence to justify giving a provocation/manslaughter instruction, then a fortiori there must have been enough evidence to instruct on second degree murder.

The problem with defendant's analysis is that there was insufficient evidence of provocation to justify *any instructions* on that subject. Thus, the trial court's instruction on manslaughter was inappropriate and unnecessary, though obviously not prejudicial to defendant.

Defendant introduced no evidence whatsoever to support a defense of provocation, or to indicate he was relying on one. Instead, he attempted to mount an *alibi* defense, to cast suspicion on another acquaintance of Castro, and to impeach witness Fuller's incriminating testimony. A provocation defense would have been inconsistent with the foregoing denial of guilt. Under such circumstance, no sua sponte instruction was required. (*People v. Wickersham*, *supra*, 32 Cal. 3d at p. 328; *People v. Sedeno* (1974) 10 Cal. 3d 703, 716 . . . .)

Defendant observes, however, that at an in-chambers conference with the court at the close of trial, his counsel indicated he would also rely on a provocation defense, a defense that the jury might accept despite rejecting the alibi defense. Counsel cited the testimony of interrogating officer McCarthy that, according to defendant, Castro first became intoxicated and then became emotional and upset,

36

United States District Court

For the Northern District of California

1

2

complaining about being mistreated by men, "hollering" at defendant, and "knocking things over" before finally going to sleep.

3

4

5

6

Significantly, nothing in the portion of defendant's statement that was summarized by the testifying officer indicated *any* relevant effect on defendant's state of mind resulting from Castro's words or actions.  Indeed, according to his statement, he was *not* provoked into killing Castro.  Thus, the foregoing evidence would have given the jury no basis whatever for concluding that defendant "formed the intent to kill as a direct response" to Castro's conduct as required by *Wickersham, supra,* 32 Cal. 3d at page 329. [additional citations omitted].

7

8

9

10

11

12

13

The trial court likewise expressed its doubt that defendant's provocation evidence was "substantial" enough to justify a provocation/manslaughter instruction, but nonetheless indicated it would give the instruction (only as to Castro) to avoid possible reversal on appeal.  The court cited a reference in prosecution witness Fuller's testimony to the effect that defendant told her he had become "upset" with Castro.  In fact, Fuller testified that, according to defendant, Castro became intoxicated and *depressed*, and that defendant became "sick and tired of her . . . being depressed, so he hit her and knocked her out."  We conclude that such meager evidence, suggesting passive conduct by Castro, and being contrary to defendant's own statement to the officers, would not be a sufficient basis for concluding that Castro actively provoked defendant into killing her.

14

15

16

Defendant contends that because the trial court instructed on provocation/manslaughter, there must have been evidence to support a provocation/second degree murder theory.  We have previously rejected similar contentions. [citations omitted].

17

18

19

20

21

We conclude the trial court did not err in failing to instruct sua sponte on a provocation/second degree murder defense.  In light of our conclusion, we need not consider whether defendant was prejudiced by the failure to instruct.  We observe, however, that the evidence overwhelmingly supports a finding that both murders were premeditated, deliberate, and unprovoked, being committed to facilitate a burglary of the victims' home, and to prevent them from identifying defendant as the burglar.  (See, e.g., *People v. Pride* (1992) 3 Cal. 4th 195, 247-248 . . . [finding evidence of premeditation based partly on victims' multiple stab wounds].)

22

*Johnson*, 6 Cal. 4th at 42-44.

23

Petitioner maintains that the trial court was obligated to give the instruction regarding

24

provocation and second degree murder under state law.  *See Wickersham*, 32 Cal. 3d at 329.

25

Petitioner acknowledges that the California Supreme Court held that the trial court ruled that there

26

was no violation of state law, but argues nonetheless that failure to give the instruction raised a

27

28

37

1    federal issue because omission of the instruction violated petitioner's rights to due process.  *See*

2    *Estelle*, 502 U.S. at 72.

3         Petitioner is incorrect, and cannot demonstrate that the state court's decision was contrary to,

4    or an unreasonable application of, clearly established federal law.  Nor can he demonstrate that the

5    state court's decision was based on an unreasonable determination of the facts.

6         A state trial court's failure to give an instruction does not alone raise a ground cognizable in a

7    federal habeas corpus proceedings.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

8    The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the

9    Fourteenth Amendment.  *See id.*

10

11        Due process requires that "'criminal defendants be afforded a meaningful opportunity to

12   present a complete defense.'"  *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting

13   *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Therefore, a criminal defendant is entitled to

14   adequate instructions on the defense theory of the case.  *See Conde v. Henry*, 198 F.3d 734, 739 (9th

15   Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such

16   instruction was supported by the evidence).  A defendant is entitled to an instruction on his defense

17   theory only "if the theory is legally cognizable and there is evidence upon which the jury could

18   rationally find for the defendant."  *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009)

19   (internal quotations omitted).

20

21        Due process does not require that an instruction be given unless the evidence supports it.  *See*

22   *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir.

23   2005).  The defendant is not entitled to have jury instructions raised in his or her precise terms

24   where the given instructions adequately embody the defense theory, *United States v. Del Muro*, 87

25   F.3d 1078, 1081 (9th Cir. 1996); nor is defendant entitled to an instruction embodying the defense

26   theory if the evidence does not support it, *Menendez*, 422 F.3d at 1029.

27

28

United States District Court
For the Northern District of California

38

United States District Court

For the Northern District of California

The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d 470, 475-476 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).  The Ninth Circuit has stated there is no duty to instruct on lesser included offenses absent sufficient evidence.  *Solis v. Garcia*, 219 F.3d 922, 929-930 (9th Cir. 2000)  (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice); *see also Cooper v. Calderon*, 255 F.3d 1104, 1110-1111 (9th Cir. 2001) (no duty in death penalty case to instruct on second degree murder as a lesser included offense because the evidence established that the killer had acted with premeditation, so if the jury found that the defendant was the killer, it necessarily would have found that he committed first degree murder).

As the caselaw demonstrates, petitioner was entitled to an instruction regarding provocation and second degree murder only if the evidence so warranted it.  The California Supreme Court closely examined the record and determined that "there was insufficient evidence of provocation to justify *any instructions* on that subject."  *Johnson*, 6 Cal. 4th at 43.  Petitioner cites to nothing in the record indicating that the state court's factual determinations were unreasonable, and thus this court must defer to them under AEDPA.  *See* 28 U.S.C. § 2254(e)(1).

Even if petitioner had demonstrated instructional error, his claim would not succeed because he  cannot demonstrate that he suffered any prejudice as a result of alleged instructional error.  Even if a petitioner meets the requirements of section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 638.  Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they

United States District Court

For the Northern District of California

1  can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637.  As the California

2  Supreme Court noted, the evidence presented at petitioner's trial "overwhelmingly" supported a

3  finding of first degree murder, and there is no evidence that, had the instruction in question been

4  read, the jury was likely to have returned a different result.  *Johnson,* 6 Cal. 4th at 44.  Accordingly,

5  petitioner's claim is denied.

6

7

8  **G.     Claim L**

9       In Claim L, petitioner maintains that the trial court, in violation of the Fifth, Sixth, Eighth

10  and Fourteenth Amendments, failed to instruct the jury that intent to kill is an element of the

11  multiple murder special circumstance.  According to petitioner, this is reversible error.  The

12  California Supreme Court addressed this claim in a reasoned opinion on direct appeal.

13

14       In *Carlos v. Superior Court* (1983) 35 Cal. 3d 131 [parallel citations omitted],
15  we held that intent to kill was a necessary element of the felony-murder special
   circumstance, and in *People v. Turner* (1984) 37 Cal.3d 302 [parallel citations
16  omitted] we extended the *Carlos* holding to multiple-murder special circumstance.
   We over-ruled both *Carlos* and *Turner* in *People v. Anderson* (1987) 43 Cal. 3d 1104
17  [parallel citations omitted].  As to offenses committed after *Carlos* and before
   *Anderson*, however, due process and ex post facto principles demand that the intent-
18  to-kill requirement apply to any felony-murder special circumstance charged in
   connection with such offenses. [citations omitted] The offenses here occurred in
19  January 1986, during the foregoing "window period" between *Carlos* and *Anderson*.

20       Presumably, the foregoing constitutional considerations would likewise apply
   to the multiple-murder special circumstance alleged here.  The Attorney General does
21  not contend otherwise.  Indeed, the People concede that *Carlos* error occurred here,
   and they contend that such error was harmless.  (See *People v. Harris* (1989) 47 Cal.
22  3d 1047, 1100; *People v. Odle* (1988) 45 Cal. 3d 386, 414-415 [parallel citations
   omitted.]) *Odle* concluded that a harmless error analysis pursuant to *Chapman v.*
23  *California, supra*, 386 U.S. at page 24, is appropriate and constitutionally permissible
   in cases involving failure to instruct on an element of a special circumstance.  *Odle*
24  reasoned that there is no constitutional right to a jury trial on the issue of a
   defendant's eligibility for the death penalty, an issue which, but for the mandate of a
25  state statute, would be a sentencing issue.  (45 Cal. 3d at pp. 411-412.)

26       Although defendant asserts that *Odle, supra*, 45 Cal. 3d 386, was incorrectly
27  decided, we have repeatedly declined to reexamine our holding in that case. [citations
   omitted].
28

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court

For the Northern District of California

Our review of the record confirms that the court indeed failed to instruct the jury that an intent to kill was a prerequisite to finding true the multiple-murder special circumstance.  Moreover, we cannot necessarily infer such a finding from the jury's verdict or findings based on the court's other instructions. [citation omitted].  Although the jurors were instructed regarding premeditated murder and its intent element, they were also instructed on felony murder.  Thus, although the issue of intent was not *entirely* removed from the jury's consideration (cf. *United States v. Gaudin* (9th Cir. 1993) 986 F.2d 1267), its finding of first degree murder did not necessarily include a determination that defendant intended to kill both of his victims.

But as we explain, the evidence of defendant's intent to kill both victims was overwhelming, and the jury could have had no reasonable doubt on that matter.  As in *People v. Odle, supra,* 45 Cal.3d at page 416 "this is a case in which the facts overwhelmingly demonstrate that the instructional error was harmless."  (See also *People v. Harris, supra,* 47 Cal. 3d at p. 1100 [failure to instruct on intent to kill harmless where evidence of such intent overwhelming].)

The dissent herein relies on *Yates v. Evatt* (1991) 500 U.S. 391 [parallel citations omitted], disapproving language in an earlier case (*Rose v. Clark* (1986) 478 U.S. 570, 579 [parallel citations omitted]), relied on in part by *Odle*, *supra*, 45 Cal. 3d at pages 413 through 414.  But *Yates's* criticism of *Rose v. Clark* was made in the context of determining the proper harmless error standard for *rebuttable presumptions*.  (See 500 U.S. at pp. 402-403, fn. 8 [parallel citation omitted].)  *Yates* concerned the applicable harmless error test where the jury had been improperly instructed that an element of the offense (malice) could be *presumed* from certain facts (intentional commission of unlawful act, or use of a deadly weapon).  Thus, if an intent to kill were an element of the offenses charged herein (rather than pertaining to the special circumstance finding), and if the jurors herein had been told that the defendant's intent to kill was *presumed* by reason of certain facts in the case*, Yates* would require the following showing in order to find the error harmless beyond a reasonable doubt under *Chapman v. California*, *supra*, 386 U.S. at p. 24. [parallel citation omitted]:

"[T]he issue under *Chapman* is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption.  Since that enquiry cannot be a subjective one into the juror's minds, a court must approach it by asking whether the force of the evidence presumably considered by the jury in accordance with the instructions *is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption*." (500 U.S. at p. 404-405 [parallel citations omitted], italics added; see also *Sullivan v. Louisiana* (1993) ___ U.S. ___ [124 L.Ed. 2d 182, 188-189, 113 S.Ct. 2078, 2081] [*Chapman* test requires finding jury's guilty verdict "surely unattributable" to error; faulty instructions on reasonable doubt deemed reversible per se].)

In the present case, the jurors were not told to apply any improper presumptions as to the intent-to-kill issue.  Accordingly, the test of *Yates v. Evatt*, *supra*, seemingly would be inapplicable here.  But, as will appear, even were we to apply that test, we would conclude that the evidence before the jury was so overwhelming as to

leave it beyond a reasonable doubt the verdict would have been the same had the jury been instructed regarding the necessity of finding an intent to kill.

We briefly review the evidence as it bore on the intent issue:

### 1. *Victim Castro's murder*

Defendant strangled Castro to death with a telephone wire and set her room, and probably her body, afire.  The method of execution itself precludes any inference the murder was accidental or unintentional.  As we have repeatedly held, "this method of killing [strangulation] is indicative of at least a deliberate intent to kill. [Citations.]" (*People v. Hernandez*, *supra*, 47 Cal. 3d at p. 349.)

The jury's first degree murder finding reflected the jury's determination that Castro's murder was either (1) premeditated, (2) committed in the course of a burglary, requiring a preexisting specific intent to steal, and/or (3) committed in the course of a rape.  On this record, the only reasonable conclusion one can draw from the evidence and the jury's findings is that defendant intentionally murdered Castro to facilitate his escape and preclude his apprehension after raping her and/or stealing her jewelry.  Defendant, relying on an alibi defense, introduced *no evidence* which would have justified a finding of unintentional homicide.

### 2. *Victim Holmes's murder*

As for Holmes, defendant admitted that she became aware of his presence in the house with Castro on the night of the murders.  According to witness Fuller, defendant admitted "hitting" Holmes after she came upstairs to inquire about Castro, who was already unconscious from defendant's assault on her.  The evidence shows that defendant stole Holmes's jewelry and beat her to death by kicking her 10 to 12 times in her face and head.  As we have explained, there was no substantial evidence that Holmes provoked the assault.  Once again, the methodical method of execution would preclude any inference the killing was accidental or unintentional.  (See *People v. Pride*, *supra,* 3 Cal. 4th at p. 247 [multiple stab wounds consistent with finding of premeditated murder]; *People v. Hernandez*, *supra*, 47 Cal. 3d at p. 350 ["calculated" rather than "random" method of killing may be indicative of premeditated murder]; *People v. Anderson*, *supra*, 70 Cal.2d at p. 27 ["exacting" manner of killing indicative of premeditated murder].)  Again, the only reasonable conclusion the jury could have drawn was that defendant, after killing Castro, then killed Holmes to facilitate his escape and preclude his apprehension.

We conclude that the error in failing to instruct on intent to kill with respect to Castro and Holmes was harmless beyond a reasonable doubt.

*Johnson*, 6 Cal. 4th at 44-47.

Petitioner argues that the California Supreme Court's decision was in error, and that he is entitled to relief on this claim.  Petitioner is incorrect, and cannot demonstrate that the state court's

United States District Court<br>For the Northern District of California

1    decision was contrary to, or an unreasonable application of, clearly established federal law.  Nor can

2    he demonstrate that the state court's decision was based on an unreasonable determination of the

3    facts.

4            To begin with, petitioner characterizes the state court decision as a retroactive application of

5    *Anderson*.  This characterization, however, is without merit.  As the above excerpt from the state

6    court's opinion confirms,  the California Supreme Court did not retroactively apply *Anderson*.  To the

7    contrary, the state court confirmed that there had been *Carlos* error, but that any error had been

8    harmless.  *Johnson*, 6 Cal. 4th at 45-48.

9

10           Petitioner's remaining arguments are also without merit.  Petitioner maintains that failing to

11   instruct on this element of the special circumstance that subjected petitioner to the death penalty

12   amounts to a violation of his Sixth Amendment right to a jury determination of each element of the

13   charged offense.  In support of his argument, petitioner cites to *Ring v. Arizona*, 536 U.S. 584 (2002),

14   where the United States Supreme Court held that capital defendants are entitled to a jury

15   determination of any fact on which the legislature conditions increase in their maximum punishment.

16   The Court has since held, however, that *Ring* does not apply retroactively to cases that were already

17   final on direct review, and that *Ring* does not fall into any exceptions to the *Teague* rule.  *Shriro v.*

18   *Summerlin*, 524 U.S. 348 (2004).   Petitioner's case was final on direct review well before 2002, and

19   thus he may not rely on the reasoning in *Ring* for relief.

20

21           Petitioner also argues that he was deprived of his due process right not to be convicted except

22   upon a finding of beyond a reasonable doubt of each element of the charged offense.  The critical

23   inquiry on review of such a claim is whether, after viewing the evidence in the light most favorable to

24   the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

25   a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979).  As the exhaustive discussion

26   of the California Supreme Court confirms, the evidence – including the method of the killings and

27   absence of any evidence of provocation – was more than sufficient for a rational trier of fact to find

28

United States District Court
For the Northern District of California

that petitioner possessed the intent to kill.  *Johnson*, 6 Cal. 4th at 47.  Petitioner cannot demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.  Nor can he demonstrate that the state court's decision was based on an unreasonable determination of the facts; as such, this argument does not entitle petitioner to relief.

Petitioner also maintains that, because the California Supreme Court had reversed other death penalty cases for *Carlos* error, the fact that his was not reversed amounts to a violation of his equal protection rights.  *See, e.g.*, *People v. Ratliff*, 41 Cal. 3d 675, 698 (1986).  This argument may be quickly dismissed.  To begin with, as respondent points out, the California Supreme Court has also affirmed death penalty cases involving *Carlos* error, finding any error was harmless.  *See, e.g.*, *People v. Osband*, 13 Cal. 4th 622 (1996).  Petitioner cannot show that the California Supreme Court ever held that *Carlos* error was reversible *per se* and not subject to harmless error review.  In addition, as petitioner can cite to no federal authority compelling the relief he seeks, this argument both fails on the merits and appears barred by *Teague*, and does not fall into a category that warrants application of the exceptions to *Teague*.

In addition, petitioner argues that while the California Supreme Court was correct in determining that any error should be analyzed under the *Chapman* harmless error test (*Chapman v. California*, 386 U.S. 18, 24 (1967)), the state court was incorrect in its finding that the error was in fact harmless.  Petitioner cannot demonstrate, however, that the state court's reasoned decision was contrary to, or an unreasonable application of, clearly established federal law.  Nor can he demonstrate that the state court's decision was based on an unreasonable determination of the facts; as such, this argument does not entitle petitioner to relief.

The United States Supreme Court has held that, when a state court finds a constitutional error harmless under *Chapman*, a federal court may not grant habeas relief unless the state court "applied harmless-error review in an objectively unreasonable manner."  *Mitchell v. Esparza*, 540 U.S. 12, 18-19 (2003) (citations omitted).  As the lengthy excerpt, *supra*, makes clear, the California Supreme

44

United States District Court
For the Northern District of California

1  Court carefully applied the *Chapman* standard, and petitioner cannot demonstrate that the court's

2  analysis was unreasonable under clearly established United States Supreme Court law.   The state

3  court did not summarily decide that the *Carlos* error was harmless.  Rather, it separately examined

4  the death of Castro and the death of Holmes, and found harmless error only after examining the

5  circumstances of death and other record evidence.  *Johnson*, 6 Cal. 4th at 47.   As such, it was not

6  "objectively unreasonable" for the California Supreme Court to conclude that the *Carlos* error was

7  harmless.

8

9         In his attempt to show that he is entitled to relief, petitioner primarily maintains that the

10  California Supreme Court misinterpreted the evidence and wrongly concluded his conviction should

11  be affirmed.  Petitioner may disagree with the state court's analysis of the facts, but this court has

12  reviewed the record and petitioner has not shown that the state court's factual determinations, which

13  are entitled to a presumption of correctness, were unreasonable.   *See* 28 U.S.C. § 2254(e)(1).  As

14  such, his argument must fail under AEDPA.

15         Finally, petitioner argues that his trial counsel was ineffective for failing to request that the

16  jury be instructed that it must determine whether he intended to kill in order to find the special

17  circumstance true.  To prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner

18  must first establish that counsel's performance was deficient, *i.e.* that it fell below an "objective

19  standard of reasonableness" under prevailing professional norms.  *Strickland v. Washington*, 466 U.S.

20  668, 687-688 (1984).  In addition, petitioner must establish prejudice, *i.e.* that counsel's errors were

21  so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  *Id.* at 688.

22         To begin with, petitioner cannot show that his counsel was in error by not requesting the

23  instruction.  As petitioner concedes and as the record confirms, neither the prosecutor nor the trial

24  judge believed that such an instruction was necessary in light of the *Anderson* decision, and thus any

25  request for the instruction was likely to have been denied.   *Strickland* and its progeny do not require

26  that trial counsel make futile motions, and thus, the decision of petitioner's counsel was reasonable

45

under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  Furthermore, petitioner cannot demonstrate that he suffered any prejudice due to his counsel's failure to request an intent to kill instruction.  Given that the request would likely have been denied, there is no reasonable probability that, had the request been made, the result of the proceeding would have different.  *Strickland*, 466 U.S. at 693-694.  Finally, as the California Supreme Court confirmed in its reasoned opinion, there was more than substantial evidence demonstrating intent to kill, and any error in failing to read those instructions was harmless.  *Johnson*, 6 Cal. 4th at 47.   Accordingly, petitioner's claim must be denied.

**H.      Claim W**

   In Claim W, petitioner maintains that a sitting juror was unconstitutionally disqualified and removed from the case in his absence.  Juror William Solano was removed from petitioner's trial jury after the trial court *sua sponte* conducted a investigation into his background and later conducted a hearing with Solano without petitioner, his attorney or the prosecutor present.

   The California Supreme Court addressed this claim in a lengthy reasoned opinion on direct appeal.

### A. *Discharge of Juror Solano*

   Defendant first contends the court erred in discharging Juror William Solano after trial had commenced.  In a related contention, defendant asserts he was wrongfully excluded from the in camera hearing held to determining whether Solano should be excused.  We conclude neither contention has merit.

   [The trial court *sua sponte* called for a conference with prosecution and defense counsel regarding the court's concerns that Juror Solano was ignoring the proceedings.] The court further indicated that police records revealed Solano had been arrested for possessing narcotics, contrary to his jury questionnaire response that his only arrest was "for being out late while under age."
. . . .

   The prosecutor asked that Solano be examined regarding his fitness to remain on the jury.  The prosecutor observed that on one occasion he noticed that Solano's

46

eyes were closed and his chin was resting on his chest.  As Solano began to fall forward, he opened his eyes in a startled manner.

Defense counsel objected to the hearing, . . . [and] also requested that defendant be present at any further hearing on Solano's status as a juror.  The court denied this request on the basis that the hearing was not part of the trial, did not involve defendant's guilt, and bore no reasonable relation to defendant's opportunity to defend himself.  Additionally, according to the court, defendant's presence might intimidate Solano and make it more difficult to extract accurate responses from him.

Defense counsel indicated that, in order to avoid alienating Solano, he too would not attend the hearing.  The prosecutor likewise elected not to attend.  The court thereupon questioned Solano in his chambers on a variety of subjects.  When asked about his response to the questionnaire inquiry regarding prior arrests, Solano acknowledged he had been arrested when cocaine had been discovered nearby, and had also been arrested for public intoxication.  When asked why he had failed to reveal that information, he replied that "I was just trying to get through with this questionnaire as soon as possible.  It just didn't seem that important to me."

Solano also acknowledged he had closed his eyes occasionally during trial, and had nodded or smiled at defendant from time to time.  According to Solano, these gestures and smiles were "just a reaction [to] someone smiling at me . . . . I smile back."

The court ruled that Solano should be excused because of his concealment of his prior arrests, and because of his sleeping during the course of the trial.  The court replaced Solano with one of the alternate jurors, Samual Ybarra.

### 1. *Defendant's absence from hearing*

Before examining the propriety of discharging Solano, we must determine whether the court erred in refusing to allow defendant personally to attend the in-chambers hearing regarding possible discharge of the juror.

The defendant has a constitutional (Cal. Const., art. I, § 15) and statutory (§§ 977, subd. (B), 1043, subd. (a)) right to be personally present at his trial.  (See also *United States v. Gagnon* (1985) 470 U.S. 522, 526 [parallel citation omitted], and cases cited [defendant has due process right to attend court proceedings if his presence has a reasonably substantial relation to his ability to defend himself].)

Under section 977, subdivision (b), the defendant "shall" be present at certain proceedings (arraignment, plea, preliminary examination, sentencing, and "those portions of the trial when evidence is taken before the trier of fact"), and "shall" also attend "all other proceedings," unless he or she files a written waiver of the right to be present at such proceedings.

Although the broad language of the foregoing section appears to grant the defendant an unqualified right to attend all in-chambers conferences, we have held that the defendant's absence from various court proceedings, "*even without waiver*, may be

47

declared nonprejudicial in situations where his presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.'" (*People v. Garrison* (1989) 47 Cal. 3d 746, 782 [additional citations omitted].)

We initially reject defendant's assertion that the Solano hearing was one involving the presentation of the evidence to "the trier of fact" withing the meaning of section 977, subdivision (b), thereby compelling his presence under the terms of that section.  It seems clear the foregoing "evidence presentation" provision has no application to in-chambers hearings on collateral matters held outside the jury's presence.

Accordingly, under the foregoing cases, in determining whether defendant was prejudiced by being excluded from the Solano hearing, we must inquire whether defendant's presence bore a "reasonably substantial relation to the fullness of his opportunity to defend against the charges" against him.  Defendant fails to explain in what manner his presence at the in-chambers hearing could have enhanced his opportunity to defend against the charges.  He suggests that had he been allowed to attend the hearing at issue, he might have helped his counsel in questioning Juror Solano.  The point seems unduly speculative, especially in light of defense counsel's own decision, previously discussed, to absent himself from the hearing rather than risk alienating the juror.  (See *Medina*, *supra*, 51 Cal. 3d at p. 903; *Hovey*, *supra*, 44 Cal. 3d at p. 585.)

In situations similar to the present case, although occurring prior to the enactment of section 977, subdivision (b), we have indicated that the defendant would have no right to attend such hearings.  (*In re Lessard* (1965) 62 Cal. 2d 497, 506 [parallel citation omitted] [absence from private conference with juror asking to be excused]; *People v. Abbott* (1956) 47 Cal. 2d 362, 372 [parallel citation omitted] [absence from hearing regarding juror's qualifications]; see also *United States v. Gagnon*, *supra*, 470 U.S. at p. 527 [parallel citation omitted] [absence from hearing to determine juror's impartiality].)

Defendant relies on various federal and sister-state cases which indicate a criminal defendant has a right to attend in-chambers conferences regarding juror impartiality, qualifications or possible misconduct.  (E.g., *Walker v. Lockhart* (8th Cir. 1988) 852 F.2d 379, 381-382; *United States v. Gay* (9th Cir. 1975) 522 F.2d 429, 435 [additional citations omitted].)  Respondent cites other cases which find no prejudicial error in excluding the defendant from such conferences.  (E.g., *U.S. v. Patterson* (9th Cir. 1987) 819 F.2d 1495, 1507, and cases cited [additional citations omitted].)

As respondent observes, many of defendant's cited cases preceded the decision of the Unites States Supreme Court in *United States v. Gagnon, supra*, 470 U.S. at pages 526-527, wherein the high court made it clear that due process principles do not entitle the defendant to appear at every encounter between judge and jurors.  As *Gagnon* explains, the central inquiry in such situations is whether the defendant's presence at the hearing reasonably could have assisted his defense of the charges against him.  (*Ibid.*)

As we have discussed, defendant fails to convince us that his presence could have assisted his defense in any way.  Thus, we conclude that, although defendant may

48

have had a statutory right to attend the Solano hearing, his exclusion therefrom did not amount to prejudicial error because it is unlikely his presence would have enhanced his opportunity to defend against the charges.  Moreover, several cases have observed that if, as a result of the hearing in question, the affected juror is discharged and an alternate juror is picked to replace him, prejudice to the defendant will not be presumed.  (See *United States v. Lustig*, *supra*, 555 F.2d 737, 746, *People v. Dell* (1991) 232 Cal. App. 3d 248, 256-257 . . . [court excused sick jurors without hearing] [additional citation omitted].)

As stated in *People v. Dell, supra,* "appellant does not claim she was actually prejudiced from the substitution of jurors nor does it appear she could reasonably make such an argument.  Alternates are selected from the same source, in the same manner, with the same qualifications and are subject to the same challenges.  Alternates have an equal opportunity to observe the entire proceedings and take the same oath as regular jurors. [Citation.] In this case, appellant had ample opportunity to voir dire the alternates and use her allotted peremptory challenges. [Citation.] Nor is there any allegation the alternates were either incompetent or biased."  (232 Cal. App. 3d at 256-257.)

The foregoing authorities seem apposite here.  Accordingly, we conclude that no prejudicial error occurred by reason of defendant's exclusion from the Solano hearing.

2. *Defense counsel's absence from hearing*

Defendant next contends that his counsel's absence from the Solano hearing deprived him of the right to counsel at a critical stage of the proceedings.  The contention lacks merit.

As previously discussed, defense counsel made a tactical decision not to attend the hearing.  Counsel indicated he wished to avoid alienating Solano should he remain a juror in the case.  Although defendant argues that such a decision required his personal consent, our decisions indicate that trial counsel has discretion to make "an informed decision as to the necessity of attending" in-chambers proceedings.  (*People v. Medina, supra,* 51 Cal. 3d at p. 904 [counsel absent from reading of testimony to jury]; see also *People v. Jackson* (1980) 28 Cal. 3d 264, 214, 315 [parallel citation omitted] [counsel authorized to make tactical decisions and control court proceedings without first obtaining personal waiver from defendant].)  Defendant's suggestion that counsel's decision to forgo the hearing reflected his *incompetence* cannot be sustained in light of the reasonable tactical consideration which, according to counsel, induced that decision.

Accordingly, we need not reach the question whether a defendant has a constitutional right to his counsel's presence at conferences called for the purpose of determining whether particular jurors should be discharged and alternates selected.  We note, however, that one recent case has held that "there is no constitutional violation when alternate jurors are substituted in the absence of counsel." (*People v. Dell*, *supra*, 232 Cal. App. 3d at p. 257; see also *In re Mendes* (1979) 23 Cal. 3d 847, 852 [parallel citation omitted].)

49

United States District Court
For the Northern District of California

### 3. *Solano was properly discharged*

Defendant next contends that the court erred in discharging Juror Solano.  As previously noted, the court discharged Solano for two reasons, namely (1) his sleeping during the trial, and (2) his untruthful or incomplete responses to the jury questionnaire.

Defendant contends there was no evidence Solano was actually sleeping.  He cites cases indicating that jury verdicts will not be overturned in the absence of "convincing proof" that a juror slept during trial.  (E.g., *Hasson v. Ford Motor Co.* (1982) 32 Cal. 3d 388, 411 [parallel citation omitted].)  Defendant observes that the court failed to inquire of Solano whether in fact he had fallen asleep, or had missed any testimony.  (See *People v. Roselle* (1912) 20 Cal. App. 420, 424 [parallel citation omitted].)

The present case does not involve a claim of juror misconduct sufficient to overturn a verdict.  Instead, we must determine whether the trial court abused its discretion in discharging one juror and substituting an alternate.  Under section 1089, the court, upon "good cause shown," may discharge any juror "found to be unable to perform his duty" at any time during the trial.  (See also Code Civ. Proc., § 233.)  The determination of "good cause" rests in the sound discretion of the court (*People v. Abbott, supra*, 47 Cal. App. 3d at p. 256), and the court's finding thereof will be upheld if substantial evidence supports it (*People v. Burgener* (1986) 41 Cal. 3d 505, 520 [parallel citation omitted]).  We have also stated, however, that a juror's inability to perform as a juror must "appear in the record as a demonstrable reality."  (*People v. Compton* (1971) 6 Cal. 3d 55, 60 [parallel citation omitted].)

Here, there was ample evidence indicating that on one or more occasions Solano had actually fallen asleep during trial.  The court, its two deputies, and the prosecutor each stated on the record that they had observed defendant exhibiting various physical indicia of sleep, including eye closures, head nodding, and slumping in his chair.

As for Solano's incomplete questionnaire responses, the court found he had failed to disclose two prior arrests.  Concealment of prior criminal charges constitutes good cause for discharge of a juror under section 1089.  (See *People v. Price* (1991) 1 Cal. 4th 324, 399-401 . . . [concealment of prior conviction and dismissed assault charge] [additional citations omitted].)  Defendant argues Solano's prior arrests were in legal effect mere detentions because no accusatory pleadings were ever filed.  (See § 849.5.)  Assuming Solano was entitled to rely on this provision in completing his questionnaire (see *McMahon v. Municipal Court* (1970) 6 Cal. App. 3d 194, 200 . . . , he could not simply ignore these incidents for he was also asked if he had ever been "accused" of a crime.  His "no" response was incomplete and misleading.  In any event, as we have discussed, the court's ruling excusing Solano can be sustained solely on the basis of its finding that Solano had fallen asleep during trial.

In a related contention, defendant suggests he was denied due process by the discharge of Juror Solano without a showing of "legal necessity."  He suggests he had a constitutional right to be tried by the first jury impaneled to try his case.  None of the

cases cited by defendant in support of this argument indicates that due process principles would forbid substitution of an alternate juror under the circumstances presented here.  (See, e.g., *U.S. v. Bates* (9th Cir. 1990) 917 F.2d 388, 392.)

Defendant also argues he was denied due process by the trial court's "ex parte" manner of investigating Juror Solano's suitability as a juror.  In defendant's view, the court "abandoned its role as a neutral arbiter" by secretly observing Solano, recording his conduct, and examining his questionnaire responses and arrest record, before announcing to the parties the court's doubts as to his suitability.

Defendant cites no cases suggesting the trial court, in the course of investigating whether good cause exists to replace a juror suspected of misconduct or inattentiveness, must reveal its concerns to the defendant or his counsel before conducting further investigation.  It is doubtful that such a limitation on the court's discretion under section 1089 is necessary to protect any of the defendant's legitimate interests.  (See *People v. Keenan* (1988) 46 Cal. 3d 478, 533 . . . [recognizing court's power to conduct "discreet and properly limited investigation" of possible juror misconduct], 539 [recognizing court's broad discretion as to the mode of investigation"].)

We conclude the court properly discharged Juror Solano.

*Johnson*, 6 Cal. 4th at 16-22.

Petitioner argues that the California Supreme Court's decision was in error, and that he is entitled to relief on this claim.  Petitioner is incorrect, and cannot demonstrate that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.  Nor can he demonstrate that the state court's decision was based on an unreasonable determination of the facts.

Petitioner first argues he had a right to be at the hearing in question.  He maintains that while the state court properly identified the correct legal principle by relying on *Gagnon*, 470 U.S. at 527, the state court unreasonably applied the facts of petitioner's case to that principle.  Petitioner maintains that his presence at the hearing would have aided in his defense.   He argues that this distinguishes his case from *Gagnon,* where the Court found that the petitioner's presence would not have assisted in his defense.  470 U.S. at 527.  Petitioner, however, is incorrect.  The primary issues were Solano's alleged sleeping during the trial and his incomplete and misleading responses on his juror questionnaire.  *Johnson*, 6 Cal. 4th at 16-22.   Petitioner's presence was not required to address

United States District Court

For the Northern District of California

either of those issues. *See, e.g., United States v. Patterson*, 819 F.2d 1495, 1507 (9th Cir. 1987) (finding no prejudicial error in excluding defendant from in-camera conferences regarding a juror's impartiality, qualifications or possible misconduct).   In addition, petitioner cannot demonstrate that any alleged error was prejudicial.  Habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht,* 507 U.S. at 638.  Because petitioner cannot establish "actual prejudice" resulting from his exclusion from the hearing, he is not entitled to relief.   *See Brecht*, 507 U.S. at 637.

Petitioner also argues that the state court erred in finding that his counsel's absence from the hearing was not reversible error.  Again, petitioner cannot demonstrate that the state court's reasoned decision was contrary to, or an unreasonable application of, clearly established federal law.  Nor can he demonstrate that the state court's decision was based on an unreasonable determination of the facts.  Petitioner argues generally that the trial court's hearing violated his rights to have an attorney present at a critical stage of the proceedings. *See*, *e.g. United States v. Cronic*, 466 U.S. 648, 659 (1984); *United States v. Bohn*, 890 F.2d 1079 (9th Cir. 1989).  Petitioner, however, cannot cite to any authority confirming that this type of hearing represents a "critical stage"[10] requiring the presence of petitioner's counsel at the hearing.[11]  Nor can he demonstrate that any alleged error resulted in prejudice to him. *See Brecht*, 507 U.S. at 637.   Accordingly, petitioner cannot demonstrate that the state court's reasoned decision was in error under AEDPA, and he is not entitled to relief.

---

[10]The stages of a prosecution deemed "critical" for Sixth Amendment purposes include, *inter alia*, arraignments, post-indictment identification lineups, hearings on pre-trial motions to suppress evidence, sentencing, court-ordered psychiatric examinations to determine competency to stand trial and future dangerousness, the decision whether to plead guilty, and the process of plea bargaining. *United States v. Hamilton*, 391 F.3d 1066, 1070-1071 (9th Cir. 2004) (citing cases).

[11] Accordingly, this portion of Claim W is also *Teague*-barred, as it would necessitate the creation of a new rule requiring that a defense counsel always be present during a judge's interaction with a sworn juror.  Further, petitioner has failed to show that this claim falls into a category that warrants application of the exceptions to *Teague.*

Finally, petitioner argues that the state court's holding that Solano was properly discharged was in error. Again, petitioner cannot demonstrate that the state court's reasoned decision was contrary to, or an unreasonable application of, clearly established federal law. Nor can he demonstrate that the state court's decision was based on an unreasonable determination of the facts. Petitioner maintains that his due process rights were violated because Solano was discharged without a finding of "legal necessity," but he cites to no clearly established federal law holding that jurors may only be dismissed for "legal necessity" or that due process prevents substitution of a juror under the circumstances presented here, where there was ample evidence that a juror had fallen asleep and that he had failed to disclose prior arrests.[12]   *Johnson*, 6 Cal. 4th at 21-22.

In sum, petitioner has not demonstrated that he is entitled to relief on this claim under AEDPA. Thus, this claim must be denied.

## CONCLUSION

For the foregoing reasons, Claims F, G, H, I, J, K, L & W in petitioner's Amended Petition For Writ of Habeas Corpus are DENIED.

IT IS SO ORDERED.

DATED: __04/05/10__

_____
THELTON E. HENDERSON
UNITED STATES DISTRICT JUDGE

---

[12] Accordingly, this portion of Claim W is also *Teague*-barred, as it would necessitate the creation of a new rule requiring "legal necessity" for dismissal of a juror. Further, petitioner has failed to show that this claim falls into a category that warrants application of the exceptions to *Teague*. To the extent petitioner is arguing that it was reversible error for the trial court to decide to *sua sponte* investigate Juror Solano, that argument is also without merit and barred by *Teague*, as petitioner can cite to no clearly established federal law holding that trial courts do not have such discretion.